USCA1 Opinion

 

 _________________________ No. 97-1327 ASSOCIATED FISHERIES OF MAINE, INC., Plaintiff, Appellant, v. WILLIAM M. DALEY, SECRETARY OF THE UNITED STATES DEPARTMENT OF COMMERCE, Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. D. Brock Hornby, U.S. District Judge] _________________________ Before Selya, Circuit Judge, Hill,* Senior Circuit Judge, and Boudin, Circuit Judge. _________________________ Gene  R.  Libby, with whom Michael  W.  MacLeod-Ball, Robert  C. Brooks, and Verrill & Dana were on brief, for appellant. David E. Frulla ,  Stanley M. Brand , and  Brand, Lowell & Ryan on brief for Seafarers International Union of North America, amicus curiae. Andrew  C.  Mergen, Attorney, Environment & Natural Resources Division, United States Department of Justice, with whom Lois  J. Schiffer, Assistant Attorney General, David  C.  Shilton and Lyn Jacobs, Attorneys, and Gene  Martin, Office of Regional Counsel, National Oceanic and Atmospheric Administration, were on brief, for appellee. _________________________ September 16, 1997 _________________________ _______________ *Of the Eleventh Circuit, sitting by designation. SELYA, Circuit  Judge. Associated Fisheries of Maine (AFM) and its amicus, the Seafarers International Union, warn that the final version of a fishery management plan promulgated by the Secretary of Commerce (the Secretary) could have significant adverse effects on the fishing industry in the Northeast and that fishermen caught in the regulatory net will not be able to survive financially. They unsuccessfully asked the district court to invalidate the Secretary's final rulemaking and thereby avert this potential calamity. They now ask us for the same relief, urging that the Secretary failed to comply with both the Magnuson Act, 16 U.S.C. SS 1801-1882 (1994), and the Regulatory Flexibility Act (RFA), 5 U.S.C.A. SS 601-612 (1994 & Supp. 1997). Although we have considerable empathy for the fishermens' concerns, we conclude, after wading through an administrative record which comprises roughly 30,000 pages, that the Secretary acted within his lawful purview. I. THE STATUTORY SCHEME Responding to depletion of the nation's fish stocks due to overfishing, Congress enacted the Magnuson Act in 1976 to protect fishery resources. See 16 U.S.C. S 1801(a). The Act created eight regional fishery management councils, each of which has responsibility for fashioning a fishery management plan (FMP)  After this litigation had begun, Congress passed the Sustainable Fisheries Act, which amended the Magnuson Act (referred to now as the Magnuson-Stevens Act). See Pub. L. No. 104-297, 110 Stat. 3559 (Oct. 11, 1996). All references herein are to the Magnuson Act, which was in effect when the challenged rules were promulgated, not to the Magnuson-Stevens Act. 3 to regulate commercial fishing within a particular geographic region. See id. SS 1852(a)(1)-(8), 1852(h)(1). When a proposed FMP (or a plan amendment) is developed, the council must submit it to the Secretary for review. See id. S 1853(c). The Secretary then determines whether the proposed FMP is consistent not only with the Magnuson Act's seven national standards for fishery conservation and management, see id. S 1851(a)(1)-(7), but also with other applicable law, including the RFA, see id. SS 1854(a)(1)(B), 1855(e). In making this determination, the Secretary must publish an appropriate notice, see id. S 1854(a)(1)(C), consider the comments engendered in response thereto,  see  id. S 1854(a)(2)(A), and consult with the Coast Guard anent enforcement, see id. S 1854(a)(2)(C). If the Secretary approves the amendment, he then promulgates final implementing regulations, which are subject to judicial review. See id. S 1855(b). II. THE COURSE OF EVENTS The New England Fishery Management Council (the Council) has authority over commercial fishing in the Atlantic Ocean off the New England coast. See id. S 1852(a)(1). Under its aegis, the management and conservation of the New England Groundfish Fishery has had a tangled history. See  generally Peter Shelley et al.,  The New England Fisheries Crisis:  What Have We Learned? , 9 Tul. Envtl. L.J. 221, 223-33 (1996). When less intrusive efforts did not  Groundfish include cod, haddock, flounder, and other species that dwell near the ocean floor.  See Shelley,  supra, 9 Tul. Envtl. 4 prevent overfishing, the Council developed the Northeast Multispecies Fishery Management Plan in 1985. The Secretary approved it only as a stopgap. Four amendments to the interim rule followed, none of which proved adequate. See Conservation  Law Found.  of  New  Eng.,  Inc. v. Franklin, 989 F.2d 54, 58 (1st Cir. 1993). Litigation over the last of these amendments resulted in a consent decree. The decree established a timetable for adopting an FMP that would reverse the continuing depletion of cod, flounder, and haddock stocks within specified periods. See id. In 1994, the Council recommended, and the Secretary, acting through the National Marine Fisheries Service (NMFS) and the National Oceanic and Atmospheric Administration, approved Amendment 5. This amendment sought to eliminate overfishing of cod, haddock, and yellowtail flounder stocks by sharply reducing permissible fishing over a five to seven year period. See 59 Fed. Reg. 9872 (1994) (final rule). To achieve this goal, the amendment proposed a gradual reduction in the annual number of working days at sea (DAS) for certain fishing vessels and created three classes of permits. See 50 C.F.R. SS 651.22, 651.4 (1995). The class that is relevant here comprises limited access multispecies permits (which, in turn, are subdivided into fleet and individual permits). Amendment 5 sets up a DAS notification program that requires vessels covered by fleet permits to notify the NMFS of departure and arrival times. See id. S 651.29. In addition, the amendment  L.J. at 223 & n.4 (listing the 13 species included in the groundfish management plan). 5 establishes a vessel tracking system (VTS) that is intended to function by means of electronic devices installed on board vessels with individual permits. See  id. S 651.28. Because the VTS is not yet operational, both classes of permit holders must satisfy the call-in requirements of the DAS notification program for the time being. See id. S 651.29(a)(2). Dismayed by the Secretary's handiwork, AFM challenged Amendment 5 in Maine's federal district court. By that time, however, haddock and yellowtail stocks had collapsed, and cod stocks were near collapse. See NMFS,  Report of the 18th Northeast Regional Stock Assessment Workshop (18th SAW): The Plenary 53-54 (1994). In light of this troubling new information, Amendment 5 seemed inadequate either to protect or rebuild these stocks, and NMFS's Stock Assessment Review Committee recommended that the Council reduce ichthyic mortality to as low a level as possible. See id. at 53. In response, the Council adopted Amendment 6 (an emergency measure designed to protect haddock, see 59 Fed. Reg. 32,134 (1994)) and thereafter developed Amendment 7. The Secretary promulgated Amendment 7 as a final rule after notice and comment. See 61 Fed. Reg. 8540 (proposed rule) & 27,710 (1996) (final rule) (to be codified at 50 C.F.R. pt. 651). Among other things, Amendment 7 seeks to reduce ichthyic mortality rates and rebuild multispecies stocks by (1) setting annual "allowable catch" targets for regulated species, (2) orchestrating new area closures, and (3) implementing further DAS cutbacks (including acceleration of the reduction schedule originally 6 established in Amendment 5). Although the Secretary acknowledged the significant negative economic impacts (especially on trawl vessels) which Amendment 7 would invite, he concluded that conservation of the fishery would yield greater long-term benefits. See 61 Fed. Reg. at 27,731. Unmollified, AFM amended its pending judicial complaint to challenge Amendment 7 as well as Amendment 5. It alleged, inter alia, that both amendments violated the Magnuson Act and the RFA. The parties filed cross-motions for summary judgment. The district court then held a one-day informational hearing, during which the parties' experts explained their respective positions on scientific, economic, and ecological principles. In the end, the court granted summary judgment in the Secretary's favor. See  Associated Fisheries of Me., Inc. v.  Daley, 954 F. Supp. 383 (D. Me. 1997). As to issues that are relevant in this appeal, the court held that the newly enacted judicial review provisions of the RFA did not apply retroactively, and that, in all events, the Secretary had complied with the RFA. See id. at 386- 87. The court also held that the Secretary's rulemaking did not run afoul of the Magnuson Act. See id. at 388-90. AFM now  Because the Secretary recognized his inability to foresee the effect of various measures with certitude, he inserted in Amendment 7, as in Amendment 5, a process that allows him to adjust DAS allocations and requirements as stocks recover or as other circumstances change. See 50 C.F.R. S 651.40. 7 appeals. III. THE STANDARD OF REVIEW We review a district court's grant of summary judgment de novo. See Coyne v. Taber  Partners  I, 53 F.3d 454, 457 (1st Cir. 1995);  Massachusetts Dept. of Pub. Welfare v.  Secretary of Agric. , 984 F.2d 514, 520 (1st Cir. 1993). This rubric has a special twist in the administrative law context. The Magnuson Act incorporates the familiar standard of review associated with the Administrative Procedure Act (APA). See 16 U.S.C. S 1855(b). Where the APA standard obtains, a court may set aside an administrative action only if that action is arbitrary, capricious, or otherwise contrary to law. See 5 U.S.C. S 706(2)(A)-(D). Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow. See Citizens  to  Preserve Overton  Park,  Inc. v. Volpe, 401 U.S. 402, 415-16 (1971); Sierra Club v. Marsh, 976 F.2d 763, 769 (1st Cir. 1992). Consequently, our brief _ like that of the district court _ is only to determine whether the Secretary's decision to promulgate the fishery regulation was consonant with his statutory powers, reasoned, and  In the district court, AFM advanced claims under various other statutory provisions, as well as claims implicating constitutional standards and executive orders. None was successful. See Associated  Fisheries, 954 F. Supp. at 385 & n.3. AFM does not pursue any of these theories on appeal, and we express no opinion on them. We note, moreover, that in this court, as below, AFM challenges Amendment 5, as modified by Amendment 7. For simplicity's sake, we refer mainly to the latter. 8 supported by substantial evidence in the record. See Alliance Against  IFQs v. Brown, 84 F.3d 343, 345 (9th Cir. 1996), cert. denied, 117 S. Ct. 1467 (1997); C  &  W  Fish  Co. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir. 1991); Maine v. Kreps, 563 F.2d 1052, 1055 (1st Cir. 1977). An agency rule is arbitrary and capricious if the agency lacks a rational basis for adopting it _ for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise. See  Motor Vehicles Mfrs. Ass'n v.  State Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983); Rhode Island Higher Educ. Assistance Auth. v. Secretary  of  Educ., 929 F.2d 844, 855 (1st Cir. 1991). Subject, of course, to statutory constraints, policy choices are for the agency, not the court, to make. Even if a reviewing court disagrees with the agency's conclusions, it cannot substitute its judgment for that of the agency. See Overton  Park, 401 U.S. at 416; Kreps, 563 F.2d at 1055. Finally, when reviewing agency action, we apply the same legal standards that pertain in the district court and afford no special deference to that court's decision. See Massachusetts Dept. of Pub. Welfare, 984 F.2d at 521 n.5. This approach is not altered simply because the court held an informational hearing at which experts testified. Although some degree of deference may be appropriate if a district court's determination turns on factual 9 findings, evidence presented by witnesses, or "even upon lengthy district court proceedings in which knowledgeable counsel explain the agency's decisionmaking process in detail," Sierra  Club v. Marsh, 769 F.2d 868, 872 (1st Cir. 1985), this case does not implicate that principle. The district judge made it pellucid that the dissertations which he entertained "were not evidence, but rather were advocacy presentations by non-lawyers skilled in their respective areas and therefore better able to present the material to [the court]." Associated  Fisheries, 954 F. Supp. at 388 n.9. A presentation which serves only to educate the district court, not to enlarge the administrative record, does not affect the standard of judicial review. See  Fisherman's Dock Coop., Inc. v.  Brown, 75 F.3d 164, 168 (4th Cir. 1996). IV. CLAIMS IMPLICATING THE MAGNUSON ACT AFM asseverates that Amendment 7 violates the Magnuson Act because the regulation is unnecessary to achieve the Secretary's stated goals and inconsistent with the national standards embodied in the Act. Neither asseveration holds water. A. The Need for Amendment 7. The record contradicts AFM's assertion that Amendment 7 is not necessary to achieve a rebuilding of groundfish stock because the status quo suffices. The Secretary was presented with reliable scientific data indicating that stocks had collapsed; he was advised that the prophylactic measures specified in Amendment 5 were clearly inadequate to alleviate the steadily worsening plight; and he also was told that certain ichthyic mortality rates 10 ought to be reduced significantly. Responding to this influx of new information, the Council conducted extensive scientific analyses and devised Amendment 7 as a means of ensuring the long- term stability of the fishery. The Secretary studied the data, weighed plethoric comments, and decided to promulgate the rule. Having carefully reviewed the record, we cannot say that the Secretary exercised his discretion in an irrational, mindless, or whimsical manner. When an agency is faced with conflicting scientific views and chooses among them, its decision cannot be termed arbitrary or capricious. Indeed, a reviewing court must afford special deference to an agency's scientific expertise where, as here, that expertise is applied in areas within the agency's specialized field of competence. See  Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103 (1983); United  States v. Members  of  Estate  of  Boothby, 16 F.3d 19, 21-22 (1st Cir. 1994). B. Compliance with National Standards. The Magnuson Act sets up a series of seven national standards. See 16 U.S.C. S 1851(a)(1)-(7). To ensure compliance with these standards, the responsible agency must perform a cost/benefit analysis ancillary to the promulgation of an FMP. Here, the analysis for Amendment 7 showed a projected net benefit of $18 million over the ten-year rebuilding period. AFM insists that the Secretary put his thumb on the scale when conducting this analysis, and that Amendment 7 therefore fails to satisfy the national standards. Specifically, AFM charges that the Secretary 11 arbitrarily disregarded certain enforcement and compliance expenses which, when properly included, would demonstrate that the likely costs of Amendment 7 substantially exceed the likely benefits. The Magnuson Act defines "optimum yield" as the amount of fish which will secure the greatest overall benefit to the nation based on the maximum sustainable yield from a fishery, as modified by relevant economic, social, or ecological factors. See id. S 1802(21). The bedrock principle of National Standard 1 is that conservation and resource management measures, such as Amendment 7, "shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." Id. S 1851(a)(1). Relatedly, National Standard 7 requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." Id. S 1851(a)(7). In pursuance of his statutory duty, see id. S 1851(b), the Secretary established regulatory guidelines to assure that FMPs would be developed in accordance with these national standards. See 50 C.F.R. pt. 602 (1995). The regulatory guidelines make it plain that the agency should weigh the costs associated with an FMP (including industry compliance and enforcement costs) against the forecasted benefits. See id. S 602.17(b)(2)(vii), (d). In this case, the Secretary excluded Coast Guard enforcement costs from the calculus. AFM terms this exclusion arbitrary, but the administrative record belies that characterization. The Secretary specifically addressed this issue 12 and the documentation supporting the final rules contains a rational explanation for his decision. Although the Coast Guard estimated that Amendment 7 would increase enforcement costs by approximately $20,800,000 per year, its estimate assumed sea-based enforcement whereas Amendment 7, as drafted, relied primarily on land-based enforcement through the notification and tracking systems. See 61 Fed. Reg. at 27,719. Even if certain sea-based costs occurred under Amendment 7, the Secretary explained, they would not comprise increases in overall costs because they would "actually represent programmatic improvements that could also be expected to be made in the out years of [Amendment 5]." Id. For this reason, the Secretary's cost/benefit analysis explicitly assumed that Amendment 7 would not yield enforcement costs greater than those which would have been borne under Amendment 5. See 61 Fed. Reg. at 27,719, & 27,722. In our view, this explanation is sufficiently logical, and sufficiently rooted in the record, to dispose of AFM's argument concerning Coast Guard enforcement costs. It also answers AFM's additional argument that the Secretary improperly excluded the costs of industry compliance with Amendment 7. The Secretary's assumption _ that compliance costs will not vary materially as  Moreover, as alluded to in agency correspondence and further explicated during the informational hearing held by the district court, the Secretary considered the Coast Guard's estimate to be budgetary in nature and not rooted in cost increases which were likely to accompany the implementation of Amendment 7. The Secretary must be accorded some latitude to make such judgment calls. Cf. Sierra Club, 976 F.2d at 771. 13 between Amendment 5 and Amendment 7 _ flows rationally from Amendment 7's retention of the enforcement mechanism established under Amendment 5. See 50 C.F.R. S 651.29. Consequently, since Amendment 7 does not alter the taxonomy that determines which vessels will require VTS installations, AFM's claim that the new regulation fails to account for added VTS-related costs lacks force. To recapitulate, the record reveals that the Secretary carefully considered the enforcement measures associated with Amendment 7 and, consistent with the evidence before him, concluded (1) that the Coast Guard estimate was largely a figment of bureaucratic imagination which did not track the actual enforcement mechanism needed for the FMP, and therefore did not warrant inclusion in the calculus of likely costs and benefits, and (2) that compliance costs for the fishing industry would remain roughly the same under Amendment 7. Whether or not we, if writing on a pristine page, would have reached the same set of conclusions is not the issue. What matters is that the administrative judgment, right or wrong, derives from the record, possesses a rational basis, and evinces no mistake of law. Consequently, it merits our approbation. See State  Farm, 463 U.S. at 43; Kreps, 563 F.2d at 1056. The sockdolager, of course, is the enormous difficulty of estimating enforcement costs in advance. Administrative  The agency discussed this difficulty in the final environmental impact statement and noted that it was compounded 14 decisionmaking is not an exact science, and judicial review must recognize that some arbitrariness is inherent in the exercise of discretion amid uncertainty. Accordingly, courts reviewing this type of administrative decision must leave room for a certain amount of play in the joints. See Fisherman's  Dock, 75 F.3d at 171-72; Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1460 (9th Cir. 1987) (per curiam). Here, the reasons offered to explain the Secretary's determination that Amendment 7 is consistent with the national standards reflect an understanding of analytical factors and constitute a rational exercise of deliberative decisionmaking. Hence, we cannot say that this determination offends the applicable standard of review. V. CLAIMS IMPLICATING THE REGULATORY FLEXIBILITY ACT An FMP (or a plan amendment) promulgated pursuant to the Magnuson Act must be consistent with the RFA. See 16 U.S.C. SS 1854(a)(1)(B), 1855(e). AFM next charges that the Secretary failed to meet this obligation when promulgating Amendment 7. Some background may prove helpful. Congress enacted the RFA to encourage administrative agencies to consider the potential impact of nascent federal regulations on small businesses. See Pub. L. No. 96-354, S 2(b), 94 Stat. 1164, 1165 (1980) (statement of purpose);  see  generally Paul R. Verkuil,  A Critical Guide to the Regulatory  Flexibility  Act, 1982 Duke L.J. 213, 215-26 (1982). Under the RFA, an agency that publishes a notice of proposed  here because enforcement resources are shared among several management plans. 15 rulemaking must prepare an initial regulatory flexibility analysis (IRFA) describing the effect of the proposed rule on small businesses and discussing alternatives that might minimize adverse economic consequences. See 5 U.S.C. S 603. When promulgating a final rule, the agency not only must prepare a final regulatory flexibility analysis (FRFA) but also must make copies available to members of the public and publish directions for obtaining such copies. See id. S 604. The Secretary promulgated Amendment 7 on May 31, 1996. At that time, the law expressly prohibited judicial review of agency compliance with sections 603 and 604. See id. S 611; see also Thompson v. Clark, 741 F.2d 401, 404-05 (D.C. Cir. 1984). Approximately two months earlier, however, Congress had amended the RFA by enacting the Small Business Regulatory Enforcement Fairness Act (SBREFA), Pub. L. No. 104-121, tit. II, 110 Stat. 857, 864-68 (1996). The 1996 Amendments reshaped the contours of the mandated flexibility analysis and provided for judicial review of the agency's product. See id. SS 241, 242, 110 Stat. at 864-66 (codified as amended at 5 U.S.C. SS 604(a), 611(a)(1) (Supp. 1997)). Because Congress delayed the effective date of these amendments until ninety days after passage, see id. S 245, 110 Stat. at 868, they were not in effect when the Secretary promulgated Amendment 7. A. Judicial Review. The threshold question is whether we have jurisdiction to review AFM's claim under the RFA. This question depends on whether 16 the judicial review provision contained in the 1996 Amendments applies retrospectively. AFM argues that the judicial review provision should be accorded retroactive application under  Landgraf v.  USI Film Prods. , 511 U.S. 244 (1994). Judge Hornby concluded otherwise, remarking the absence of any express legislative intent to apply the SBREFA retroactively, and reasoning that, inasmuch as the 1996 Amendments were "one legislative package," "[i]t would be anomalous to apply the judicial review portion of the 1996 amendments to past agency actions but at the same time not apply the substance of those amendments." Associated Fisheries, 954 F. Supp. at 387. The Supreme Court decision in Landgraf and, more recently, the decisions in  Lindh v.  Murphy, 117 S. Ct. 2059 (1997), and Hughes Aircraft Co. v. United States, 117 S. Ct. 1871 (1997), provide a roadmap for deciding questions of retroactivity. The roadmap is not easy to use, and in this case the guideposts point in more than one direction. On one hand, the delayed effective date points toward prospective application,  see  Wright v.  FEMA, 913 F.2d 1566, 1572 & n.13 (11th Cir. 1990);  Criger v.  Becton, 902 F.2d 1348, 1351 (8th Cir. 1990), and the legislative history of the 1996 Amendments points the same way, see 142 Cong. Rec. E571, E574 (daily ed. Apr. 19, 1996) (statement of Rep. Hyde) (twice indicating that judicial review would be available for rules promulgated after the effective date). On the other hand, the new judicial review provision does not affect substantive rights but merely confers jurisdiction, and courts often give retroactive 17 effect to such statutes. See Landgraf, 511 U.S. at 274; but see Hughes Aircraft , 117 S. Ct. at 1878 (drawing a distinction between an amendment which merely allocates jurisdiction among fora and one which creates jurisdiction where none previously existed, and stating that the latter is subject to the presumption against retroactivity). Moreover, the Third Circuit, contradicting Judge Hornby's "one legislative package" rationale, recently held that the 1996 Amendments were severable and that the judicial review provision could be applied to a legislative rule promulgated before their effective date. See Southwestern  Pa.  Growth  Alliance v. Browner, ___ F.3d ___, ___ (3d Cir. 1997) [No. 96-3364, 1997 WL 418420, at *15-16]. In the last analysis, it is unnecessary to decide the retroactivity question here. We have long adhered to the practice that, when an appeal presents a jurisdictional riddle, yet the merits of the underlying issue are readily resolved in favor of the party challenging jurisdiction, a court may sidestep the quandary and simply dispose of the appeal on the merits. See  United States v. Stoller, 78 F.3d 710, 715 (1st Cir.) (collecting cases), cert. denied, 117 S. Ct. 378 (1996). We follow that praxis today. B. The Renovated Section 604. By electing to reach the merits, we do not avoid the  Our task is made much easier because the lower court, though concluding that the judicial review provision did not apply, nonetheless proceeded to reach the merits and, in an alternate holding, laid out a blueprint that makes very good sense. See Associated  Fisheries, 954 F. Supp. at 386-87. We commend Judge Hornby for his prudent belt-and-suspenders approach. 18 question of retroactivity entirely. AFM contends that the Secretary failed to comply with section 604 of the RFA both in its original and renovated incarnations. As our next order of business, we address whether the amended version applies retroactively to this case. We hold that the Secretary's compliance with the RFA should be measured against the original requirements of section 604, that is, against the law as it read when the Secretary promulgated Amendment 7. The 1996 Amendments substantively altered section 604 by reformulating and augmenting the required content of an FRFA. See 5 U.S.C.A. S 604(a) (Supp. 1997). The renovated version now requires that an FRFA contain the following: (1) a succinct statement of the need for, and objectives of, the rule; (2) a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments; (3) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available; (4) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and (5) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives 19 to the rule considered by the agency which affect the impact on small entities was rejected. 5 U.S.C.A. S 604(a) (Supp. 1997). A comparison of this iteration with the prior version, 5 U.S.C. S 604(a) (1994), reveals that subsections (3) and (4) are brand new insofar as FRFAs are concerned, and that subsection (5), modifying the former subsection (3), imposes more specific content requirements. Since the Secretary completed the FRFA and promulgated Amendment 7 before the effective date of the 1996 Amendments, applying the neoteric version of section 604 would impose new strictures with respect to matters already completed, and, thus, would contravene the rule against retroactivity. See Landgraf, 511 U.S. at 280. AFM offers only a weak rejoinder. It says that retroactive application would not impose new duties because Congress passed the 1996 Amendments before the agency prepared the FRFA. That is so _ but it is beside the point. SBREFA's effective date constitutes the cut-off point, and the Secretary had completed and published both the FRFA and the final rule prior to that time. Thus, imposing incremental requirements on these actions would have an impermissible retroactive effect. See id. C. The Original Section 604. Having determined that the original version of section 604 governs our RFA-related review of Amendment 7, we turn to that proviso. Under it, an FRFA must contain three elements: (1) a succinct statement of the need for, and the objectives of, the rule; 20 (2) a summary of the issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments; and (3) a description of each of the significant alternatives to the rule consistent with the stated objectives of applicable statutes and designed to minimize any significant economic impact of the rule on small entities which was considered by the agency, and a statement of the reasons why each one of such alternatives was rejected. 5 U.S.C. S 604(a) (1994). Congress designed this provision "to assure that agencies engage in principled decision-making." 126 Cong. Rec. S21,448 & 21,459 (daily ed. Aug. 6, 1980). Legislative history confirms that Congress, in enacting section 604, intended to compel administrative agencies to explain the bases for their actions and to ensure that alternative proposals receive serious consideration at the agency level. See  id. at S21,460;  see  also S. Rep. No. 96-878, at 13-14 (1980),  reprinted  in 1980 U.S.C.C.A.N. at 2788, 2800-01. Notwithstanding this intention, Congress emphasized that the RFA should not be construed to undermine other legislatively mandated goals. See 126 Cong. Rec. at S21,459-60;  see  also S. Rep.  RFA traveled a somewhat unconventional route in its march towards passage. The Senate rejected the Senate bill, S. 299, as reported by the Judiciary Committee, and adopted Senator Culver's substitute bill. See 126 Cong. Rec. S21,449-51 (daily ed. Aug. 6, 1980). The House passed the bill without either amendment or separate hearings, and endorsed the Senate's section-by-section analysis. See Thompson, 741 F.2d at 406 (tracing legislative history); see generally Verkuil, supra, at 226-27. We therefore examine the substitute bill and its accompanying analysis as the relevant guide to legislative intent. 21 No. 96-878, supra, at 10, 14, 1980 U.S.C.C.A.N. at 2797, 2801. Thus, section 604 does not command an agency to take specific substantive measures, but, rather, only to give explicit consideration to less onerous options: [T]his provision does not require that an agency adopt a rule establishing differing compliance standards, exemptions, or any other alternative to the proposed rule. It requires that an agency, having identified and analyzed significant alternative proposals, describe those it considered and explain its rejection of any which, if adopted, would have been substantially less burdensome on the specified entities. Evidence that such an alternative would not have accomplished the stated objectives of the applicable statutes would sufficiently justify the rejection of the alternative. 126 Cong. Rec. at S21,459-60; see also S. Rep. No. 96-878, supra, at 14, 1980 U.S.C.C.A.N. at 2801. We think that a useful parallel can be drawn between RFA S 604 and the National Environmental Protection Act, which furthers a similar objective by requiring the preparation of an environmental impact statement (EIS). See 42 U.S.C. S 4332 (1994). The EIS requirement is meant to inform the agency and the public about potential adverse ecological effects and about the availability, if any, of less harmful alternatives prior to a final decision on the fate of a particular project or rule. See Robertson v. Methow  Valley  Citizens  Council, 490 U.S. 332, 349 (1989);  Valley Citizens for a Safe Env't v.  Aldridge, 886 F.2d 458, 459-60 (1st Cir. 1989). In light of this purpose, courts do not review challenges to the adequacy of an EIS under a standard of mathematical exactitude but under a standard of reasonableness. 22 See  Aldridge, 886 F.2d at 459;  Conservation Law Found. of New Eng., Inc. v.  Andrus, 623 F.2d 712, 719 (1st Cir. 1979). Recognizing the analogous objectives of the two acts, we believe that the same rule of reason should apply to judicial review of challenges under RFA S 604. Thus, we proceed to examine whether the Secretary made a reasonable, good-faith effort to carry out the mandate of section 604. In this instance, NMFS prepared an FRFA consisting of its initial workup (the IRFA) and its responses to submitted comments. See 61 Fed. Reg. at 27,730-31; see also 59 Fed. Reg. 9872, 9883 (1994) (final rule, Amendment 5). AFM contends that this proffer misfires for two reasons. First, AFM maintains that dressing up an IRFA by tacking on responses to comments does not comply with the statutory directive that the agency prepare an FRFA. Second, AFM asserts that the Secretary failed sufficiently to identify, and adequately to explain his rejection of, alternatives designed to minimize deleterious economic effects on small businesses. We address these objections in turn. 1. We reject AFM's charge that the FRFA is inadequate on its face. Section 604 prescribes the content of an FRFA, but it does not demand a particular mode of presentation. To disregard otherwise compliant analysis simply because it is not ensconced in  Since an EIS, unlike an FRFA, must contain a "detailed" statement, 42 U.S.C. S 4332(2)(C), the analogy seems more than fair to AFM. 23 a specific format would be inconsistent both with the RFA's explicit authorization to avoid duplicative or unnecessary analyses, see 5 U.S.C. S 605(a), and with the legislative concession that an agency "may incorporate in a regulatory flexibility analysis any data or analysis contained in any other impact statement or analysis required by law," 126 Cong. Rec. at S21,460. Accordingly, we hold that an agency can satisfy section 604 as long as it compiles a meaningful, easily understood analysis that covers each requisite component dictated by the statute and makes the end product _ whatever form it reasonably may take _ readily available to the public. We do not mean to suggest that the combination of an IRFA and responses to comments always _ or even often _ will pass muster. But in the absence of a statutory or regulatory directive specifying the form of document to be produced, the preparing agency must be accorded ample latitude in making the choice. See Town  of  Orangetown v. Gorsuch, 718 F.2d 29, 40 (2d Cir. 1983). This precept is especially pertinent here, since the IRFA was reasonably extensive, the wide range of comments anent the proposed rule (many of which were submitted by small businesses or proxies  In pressing for a contrary result, the appellant relies heavily on a letter written to NMFS by the Small Business Administration (SBA) criticizing the agency's earlier efforts to comply with the RFA in the development of Amendment 5. We give little, if any, weight to the letter. For one thing, it is directed only to compliance vis-a-vis Amendment 5. For another thing, although the RFA authorizes the SBA to appear as an amicus curiae, see 5 U.S.C.A. S 612(b) (1994 & Supp. 1997), the SBA has chosen not to exercise that prerogative in respect to Amendment 7. 24 on their behalf) provided a natural forum for the Secretary in striving to fulfill his section 604 obligation, and the agency punctiliously complied with the notice requirements of RFA S 604(b). Under these circumstances, we conclude that the Secretary acted within his proper province in designating the IRFA and the responses to comments as the FRFA required by the statute. 2. We turn now from form to substance and inspect the adequacy of the FRFA's contents. We preface this discussion by remarking two important considerations. First, section 604 does not require that an FRFA address every alternative, but only that it address significant ones. See 5 U.S.C. S 604(a)(3). Second, the majority of commercial fishing vessels in the Northeast are deemed small businesses for purposes of the RFA. See 5 U.S.C. S 601(3); 13 C.F.R. S 121.601 (1995);  see  also 61 Fed. Reg. at 27,731 (memorializing the Secretary's recognition of this reality). It follows that any attempt to reduce the adverse economic impacts of a regulation aimed at rebuilding stocks in this fishery is necessarily an attempt to minimize the negative effects of the regulation on small businesses. To that extent, Congress' desire to have agencies write rules that distinguish (where desirable) between big and small businesses has diminished relevance.  Citing 5 U.S.C. S 608(b), AFM argues that failure to prepare a suitable FRFA caused Amendment 7 to lapse. This argument is jejune. The lapse provision applies only to delayed compliance following the promulgation of emergency rules. See Thompson, 741 F.2d at 407-08. That is not the situation here. 25 After poring over the FRFA, we conclude that the Secretary fulfilled his substantive obligation under section 604. The agency's reply to a comment which suggested that the final rule violates the spirit of the RFA demonstrates a keen understanding of the RFA's objectives and states the parameters of the Secretary's obligation quite well: The intent of the RFA is not to limit regulations having adverse economic impacts on small entities, rather the intent is to have the agency focus special attention on the impacts its proposed actions would have on small entities, to disclose to the public which alternatives it considered to lessen adverse impacts, to require the agency to consider public comments on impacts and alternatives, and to require the agency to state its reasons for not adopting an alternative having less of an adverse impact on small entities. 61 Fed. Reg. at 27,721. The analysis that the agency undertook is fully consonant with this aspirational language. To begin with, the IRFA (incorporated into the FRFA) describes several possible alternatives and summarizes the potential economic impact of each. The agency concluded that each of these scenarios would have a greater negative impact on the fishing industry than would the proposed rule. For example, the agency rejected Alternative 1 (which included a ban on fishing with certain gear until the spawning stock biomass reached a minimum threshold level) because it would result in unacceptably high levels of foregone income; it rejected Alternative 2 (which proposed closing half of certain fishing areas and placing restrictions in open areas) on the basis that it would be massively 26 inefficient and would dramatically increase vessel operating costs; and it rejected Alternative 4 (which favored a quota system) for much the same reasons. The responses to submitted comments (which also form a part of the FRFA) discuss and dismiss additional alternatives. For example, responding to a comment that characterized closures in the Gulf of Maine as detrimental to the industry, NMFS explained that this was a temporary default measure to reduce ichthyic mortality in situations where DAS reductions were insufficient. In that regard, the FRFA noted that the Council had considered reducing DAS allotments but declined to pursue that alternative after receiving industry comment indicating a preference for flexibility. See 61 Fed. Reg. at 27,714-15. By like token, the agency explicated its rejection of the status quo alternative, reiterating that Amendment 5 had been conceived as a means of arresting the decline in spawning stock biomass, whereas Amendment 7 responded to a new, emerging need and purposed to rebuild the biomass to levels which would ensure stability. See id. at 27,721. The agency also explained why some DAS exemptions under the status quo alternative, which had the capacity partially to alleviate burdens on small vessels, could not be retained under the more rigorous conservation goals of Amendment 7. See id. at 27,715. We think it is noteworthy, too, that the RFA identifies steps taken for the express purpose of mitigating adverse economic impacts on small fishing businesses. In this vein, the Secretary eliminated a provision requiring layover days, thereby easing the 27 concerns of smaller vessels (which are more sensitive to inclement weather). See 61 Fed. Reg. at 27,717. Similarly, the Secretary phased in the DAS reduction schedule over two years instead of one because, though conservationists recommended an 80 percent reduction in mortality rates, the Secretary feared that vessels could not financially weather a DAS reduction greater than 50 percent. The Secretary also moved to establish a vessel buyout program reducing the socioeconomic burden on small entities. See id. at 27,731. We think that these selected examples convey the flavor of the FRFA as a whole. The point is not whether the Secretary's judgments are beyond reproach, but whether he made a reasonable, good-faith effort to canvass major options and weigh their probable effects. Here, the record reveals that the Secretary explicitly considered numerous alternatives, exhibited a fair degree of sensitivity concerning the need to alleviate the regulatory burden on small entities within the fishing industry, adopted some salutary measures designed to ease that burden, and satisfactorily explained his reasons for rejecting others. The fact that AFM has pointed to no  significant alternative that escaped the Secretary's notice attests to the thoroughness of the Secretary's efforts. Because the Secretary's specification and discussion of significant alternatives was reasonable, it fulfilled the substantive requirements of section 604. AFM makes one last-ditch argument in respect to section 604. It carps that the Secretary failed to develop an alternative 28 that substantially lessens the economic impact on small entities. This puts the catch before the cast and, in the bargain, confuses what the fishermen desire with what the statute obliges the Secretary to do. An adequate discussion of alternatives in an FRFA is context-specific. Of necessity, given the distressed condition of groundfish stocks in this fishery, any alternative consistent with the Secretary's conservation mandate under the Magnuson Act will produce economic hardships for the industry. The FRFA reveals that the Secretary assessed the potential impact of Amendment 7 on small businesses, mulled other options in good faith, and sought to strike the best available balance between conservation goals and the legitimate concerns of the fishing community. No more is exigible. D. Section 609. Section 609 of the RFA, 5 U.S.C. S 609, directs agencies to assure that small entities are given an opportunity to participate in the rulemaking process for any rule that is likely to produce significant economic impacts. AFM claims that the Secretary improperly limited participation in the process and failed to provide adequate assistance to small entities in  The 1996 Amendments provide that agency compliance with section 609 is subject to judicial review in conjunction with judicial review of challenges under amended section 604. See 5 U.S.C.A. S 609 (Supp. 1997). Noting that the substantive alterations to section 609 effected by the 1996 Amendments are of little significance to this appeal, AFM does not pursue its retroactivity argument with regard to section 609. Accordingly, we test compliance against the language of the provision as it stood on May 31, 1996 (the date the Secretary promulgated Amendment 7). 29 evaluating agency reports. We do not agree. While section 609 instructs the Secretary to assure participation, the method and manner of doing so is left primarily to the Secretary's sound discretion. In this situation, we are satisfied that the Secretary provided adequate participatory opportunities for small businesses. Council meetings were open to all interested parties and were well-attended. Public hearings were held in six states. Scientific data was broadly disseminated through open workshops and otherwise. See, e.g., 61 Fed. Reg. at 27,714 & 27,720 & 27,723. Several representatives of small entities participated in a regional stock assessment workshop, at which scientific data was presented and peer-reviewed. The nature and volume of the submitted comments is emblematic of a very high level of public participation. Furthermore, the substance of the comments leaves no doubt but that small fishing businesses were intimately familiar with the crisis and were well aware of the potential significance of the management efforts that were being studied. See 61 Fed. Reg. at 27,712-29. To be sure, the development of Amendment 7 involved daunting scientific complexities. That stems from the intrinsic nature of the problem, not from some fault on the Secretary's part. Since the Secretary provided repeated and varied opportunities for meaningful participation by small entities, he met the relatively modest demands that section 609 imposes. The complaint that the Secretary did too little to assist 30 small entities wishing to participate in the process is equally unavailing. Section 609 does not mandate specific types of assistance. Rather, it offers a list of suggested techniques to assure participation. The legislative history confirms the purport of the statutory language; agencies have the discretion to select among various methods of outreach. See 126 Cong. Rec. at S21,460. Here, the record discloses that the Secretary handled the matter in a perfectly reasonable way. VI. CONCLUSION To sum up, it is evident that rapidly deteriorating conditions required the Secretary to fish in troubled waters. The immediacy of the need to rebuild groundfish stocks left him no easy way out. In the absence of a perfect (or even near-perfect) solution, he reasoned his way to a decision that balanced the significant adverse impacts that Amendment 7 would have on the  In pertinent part, the statute directs that the promulgating agency shall assure that small entities have been given an opportunity to participate in the rulemaking for the rule through techniques such as _ (1) the inclusion in an advanced notice of proposed rulemaking, if issued, of a statement that the proposed rule may have a significant economic effect on a substantial number of small entities; . . . (4) the conduct of open conferences or public hearings concerning the rule for small entities; and . . . . 5 U.S.C. S 609 (1994). 31 industry against the severe depletion which plagued this fishery and the legal obligation to develop an FMP that would eliminate overfishing. Having carefully reviewed the administrative record, we conclude that the product of his labors _ Amendment 7 _ is rational and fairly supported by the record. We need go no further. Although we are not unsympathetic to the plight of the individuals who will suffer adverse consequences from the choices embodied in the final rule, we must uphold the balance struck by the Secretary among competing concerns. See Strycker's Bay N'hood Council, Inc. v. Karlen, 444 U.S. 223, 227-28 (1980) (per curiam). Affirmed. 32