# United States Court of Appeals
## For the First Circuit

No. 08-2169

ADMINISTRACIÓN PARA EL SUSTENTO DE MENORES
(ADMINISTRATION FOR CHILD SUPPORT) OF THE DEPARTMENT
OF THE FAMILY OF THE COMMONWEALTH OF PUERTO RICO,

Plaintiff, Appellant,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
OF THE UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before
Torruella, Boudin, and Dyk,[*]
Circuit Judges.

Pedro J. Varela-Fernández, on brief for appellant.
Catherine Y. Hancock and Michael S. Raab, Attorneys, Appellate Staff, Civil Division, Michael F. Hertz, Acting Assistant Attorney General, Rosa E. Rodríguez-Vélez, United States Attorney. As Of Counsel: David S. Cade, Acting General Counsel, Robert E. Keith, Associate General Counsel, Children, Families & Aging Division, William Alvarado-Rivera, Chief of Litigation, Children, Families & Aging Division, on brief for appellee.

December 7, 2009

[*] Of the Federal Circuit, sitting by designation.

**TORRUELLA**, **<u>Circuit Judge</u>**.  In this appeal, plaintiff-appellant Administration for Child Support, a unit of the Department of the Family of the Commonwealth of Puerto Rico ("Puerto Rico"), seeks review of a decision of the district court granting summary judgment in favor of the United States Department of Health and Human Services ("HHS" or "Agency") in a proceeding under the Administrative Procedure Act ("APA") pursuant to 42 U.S.C. § 610(c).  Puerto Rico brought this action to challenge the Agency's assessment of a financial penalty against certain federal grant money used to fund Puerto Rico's child support enforcement programs, after HHS determined that Puerto Rico had failed to satisfy data reporting requirements, or meet performance benchmarks, in consecutive fiscal years.

Puerto Rico contends that HHS acted in an arbitrary and capricious manner when it refused to accept data submitted 45 days after the regulatory deadline, and failed to provide adequate notice of its intent to assess the penalty.  It asserts that both of these actions were predicated on the Agency's unreasonable reading of applicable regulations.  The district court rejected these contentions, concluding that the Agency's interpretation of its regulations was reasonable and entitled to deference.  After careful review, we affirm.

# I.  **Background**

## A.  **Statutory and Regulatory Framework**

Puerto Rico participates in the Temporary Assistance to Needy Families, or TANF, program, which is administered by HHS pursuant to Title IV-A of the Social Security Act, 42 U.S.C. §§ 601 -619.  The TANF program provides block grants, also known as State Family Assistance Grants, to eligible states.  See 42 U.S.C. § 603(a)(1).[1]  A central purpose of these grants is to lend a hand to states which "provide assistance to needy families so that children may be cared for in their own home or in the homes of relatives."  Id. § 601.  Eligibility for TANF grants is predicated on the state's operation of child support enforcement programs -- that is, programs designed to locate non-custodial parents, establish paternity, and obtain child and spousal support -- in accordance with Title IV-D of the Social Security Act.  See 42 U.S.C. §§ 651-669b; see also 42 U.S.C. § 602(a)(2).

Title IV-D enforces strict performance standards and reporting requirements on states as a condition of funding.  Under this regime, states may qualify for incentive payments based on the relative effectiveness of their performance in five areas: paternity establishment, child support order establishment, current collections, average collections, and cost effectiveness.  42

---

[1]  Puerto Rico is treated as a state for purposes of the TANF program, 42 U.S.C. § 619(5), and Title IV-D of the Social Security Act, id. § 1301(a)(1).

U.S.C. § 658a(b)(6); 45 C.F.R. § 305.2. Each fiscal year, eligible states must submit "complete and reliable" data to demonstrate their performance in each of these areas. 42 U.S.C. § 658a(b)(5)(B); see also id. § 652(g)(1); 45 C.F.R. § 305.1(i) & (j). Data is considered "reliable" if it meets a 95% standard of reliability as determined by the Secretary of HHS, 45 C.F.R. § 305.1(i), and "complete" if it includes all reporting elements necessary to compute performance levels and is submitted within the proper timeframe, id. § 305.1(j).[2] HHS regulations set the deadline for submitting this data as the December 31st following the end of each fiscal year, i.e., the end of the first quarter following the conclusion of the fiscal year. See 45 C.F.R. § 305.32(f).

Based on this data, HHS calculates the amount of each state's incentive payments. 42 U.S.C. § 658a(b). If the Secretary determines that the data submitted by the state is reliable and complete, he will determine how the state performed with respect to each of the five performance measures as compared to other eligible states; incentive payments are then allocated to each state as a share of a fixed "[i]ncentive payment pool" set aside by Congress for each fiscal year. Id. However, if the Secretary determines that the state has submitted unreliable or incomplete data for any

---

[2] To assess the completeness, reliability, and security of the data submitted by the states and the accuracy of the reporting systems used in calculating the five performance indicators, the Secretary is obligated to conduct audits of this data at least once every three years. 42 U.S.C. § 652(a)(4)(C)(i).

particular performance indicator, or has failed to satisfy applicable performance benchmarks, the state will not receive an incentive payment for that indicator for that financial year. See id.

States are also subject to penalties based on their year-to-year performance in three of these areas: paternity establishment, support order establishment, and current collections. See 42 U.S.C. § 609. When in a given fiscal year a state fails to either submit complete and reliable data or satisfy substantive performance measures, the next fiscal year automatically becomes a "corrective action year" in which the state is required to improve its performance or face penalties. Id. § 609(a)(8)(A); 45 C.F.R. §§ 305.40, 305.61(a)-(b). That is, when a state in consecutive fiscal years fails either the data reporting requirement and/or the substantive performance requirement (including a reporting failure in one year and a performance failure in the other), it is subject to a penalty under the TANF program.

As is relevant here, states must establish a 90% "paternity establishment percentage," or PEP, for each year in order to qualify for an incentive payment for that performance indicator.[3]  42 U.S.C. § 652(g)(1)(A).  If a state's PEP falls

_____

[3]  The PEP measures a state's success at establishing the paternity of children born out-of-wedlock.  42 U.S.C. § 652(g).  A state may calculate its PEP according to either (1) the percentage of

below this 90% threshold, however, it may still satisfy this performance requirement by demonstrating a certain level of improvement over the previous fiscal year's PEP.  Id. § 652(g)(1)(B)-(F); 45 C.F.R. § 305.40(a)(1).  When a state fails to satisfy the PEP performance and/or reporting criteria in two consecutive years, it is subject to a penalty.  The penalty assessed is a certain percentage of the TANF grant; the first failure is penalized by a 1-2% reduction, but subsequent failures may be penalized by as much as 5%.  42 U.S.C. § 609(a)(8)(B); 45 C.F.R. § 305.61(c).  When a penalty is imposed, a state must expend its own funds to make up the difference.  45 C.F.R. § 262.1(e)(1).

HHS is required to "notify the State in writing" when it determines that a state is subject to a penalty.  45 C.F.R. §§ 262.7, 305.66.  The notice must inform the state of the deficiency which is the basis for the penalty, as well as the reasons for, and amount of, the penalty assessed.  45 C.F.R. § 305.66(b).  The penalty is imposed in the fiscal year following the Agency's final decision.  45 C.F.R. § 262.1(c)(2).  States may appeal to the HHS Departmental Appeals Board ("DAB") within sixty days of receipt of such notice.  42 U.S.C. § 610(b); 45 C.F.R. §§ 262.7, 305.66.

---

children born out of wedlock statewide for whom paternity is established, or (2) the percentage of children participating in state child support programs for whom paternity is established. See 42 U.S.C. § 652(g)(2); 45 C.F.R. § 305.2.

### B.  Facts and Proceedings Below

The basic facts are not in dispute.  On February 7, 2002, HHS notified Puerto Rico that its auditors had determined that Puerto Rico's fiscal year ("FY") 2001 PEP data was deficient.  As HHS explained, Puerto Rico had submitted PEP data covering its performance over an eighteen-month period from January 1, 2000 to June 30, 2001, rather than the proper twelve-month period from August 1, 2000 to July 31, 2001.  Thus, HHS determined that Puerto Rico's FY 2001 PEP data was not accurate because it included data prior to the reporting period, and was incomplete because it was missing data for July 2001.[4]

Puerto Rico attempted to submit corrected data on February 14, 2002.  However, in a letter dated March 20, 2002, HHS informed Puerto Rico that it would not accept the corrected PEP data for purposes of calculating incentive payments because the December 31, 2001 deadline set forth in 45 C.F.R § 305.32(f) had passed.  HHS explained that a "cut-off point is necessary for us to make the required performance determinations and calculations on a timely basis" because "payments of incentives cannot be made to any state until the entire process has been completed for all states in

---

[4]  HHS permits states to use a reporting period other than the federal fiscal year, provided "like" data are used and compared from year-to-year.  For FY 2000, Puerto Rico submitted data for the twelve-month period from August 1, 1999 through July 31, 2000. Accordingly, Puerto Rico was required for FY 2001 to submit data from August 1, 2000 through July 31, 2001.

a given fiscal year." Puerto Rico thus received no PEP incentive payment for FY 2001. However, because FY 2001 data was used both to compute incentive payments for FY 2001 and to qualify for FY 2002 incentives based on improved performance, HHS indicated that it would accept the corrected PEP data covering FY 2001 for the limited purpose of determining whether Puerto Rico "qualif[ied] for incentives on the basis of improved performance in FY 2002." The corrected FY 2001 data showed a PEP of 92%.

For FY 2002, Puerto Rico submitted data which showed a PEP of 88%. This PEP fell below the minimum threshold of 90% and did not demonstrate an improvement over the previous fiscal year's PEP of 92%. Thus, Puerto Rico had failed for two consecutive years to submit reliable PEP data (FY 2001) or meet substantive PEP performance targets (FY 2002). Accordingly, HHS notified Puerto Rico on November 14, 2003 that it would be penalized by 1% on its FY 2003 TANF grant. HHS ultimately assessed a penalty of $582,365.

Puerto Rico appealed this decision to the DAB and argued that the Agency had erred both by failing to accept its corrected data in February 2002, and by notifying Puerto Rico in an untimely fashion of its penalty. Puerto Rico claimed that each of these actions was based on an unreasonable interpretation of applicable regulations. The DAB rejected both contentions and upheld the penalty. Puerto Rico then filed this APA action in the district court challenging the Agency's final decision. The district court,

adopting a magistrate judge's recommendation, agreed with the DAB and granted summary judgment in favor of HHS. This appeal followed.

## II. Discussion

### A. Standard of Review

We review grants of summary judgment de novo. However, in an APA action, "'judicial review, even at the summary judgment stage, is narrow.'" Visiting Nurse Ass'n Gregoria Auffant, Inc. v. Thompson, 447 F.3d 68, 72 (1st Cir. 2006) (quoting Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)). Under the familiar APA standard, we may "only set aside agency actions, findings, and conclusions if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" Id. (quoting 5 U.S.C. § 706(2)). "[W]here Congress has entrusted rulemaking and administrative authority to an agency, courts normally accord the agency particular deference in respect to the interpretation of regulations promulgated under that authority." Id. (quoting South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 97 (1st Cir. 2002)).

### B. Late Submission of Performance Data

Puerto Rico first argues that HHS's decision not to accept the revised FY 2001 data submitted on February 14, 2002 was arbitrary and capricious. Puerto Rico asserts that because the data was submitted "only" forty-five days late, HHS had sufficient

time to consider the corrected data, which would have shown a PEP of 92% and thus no FY 2001 deficiency. Accordingly, Puerto Rico contends that HHS had "no logical or reasonable explanation" for failing to accept the FY 2001 data for purposes of determining whether reliable and complete information had been submitted for FY 2001.[5]

We hold that HHS's decision not to accept and consider Puerto Rico's untimely PEP data to determine its FY 2001 performance for incentive purposes was neither arbitrary nor capricious. An agency's interpretation of its regulations is entitled to "substantial deference," and must be given controlling weight unless it is "plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation marks omitted). Here, as Puerto Rico acknowledges, the regulation at issue unambiguously required Puerto Rico to submit the FY 2001 PEP data by December 31, 2001. 45 C.F.R. § 305.32(f). The regulation further made it clear that only

---

[5] Puerto Rico also argues that HHS has been inconsistent in the application of its guidelines because it has in other cases accepted modified data past the regulatory deadline. However, Puerto Rico has identified no instance in which HHS has accepted untimely data to determine the prior fiscal year's performance for incentive payment purposes. Rather, Puerto Rico cites to one case in which HHS requested a state to submit corrected data past the regulatory deadline for the purpose of measuring the next year's incentives based on improved performance, as it also did here. See Nevada v. Department of Health and Human Servs., No. 3:05-cv-00677 (D.Nev. Dec. 28, 2006) (slip op., appended to Appellee's brief). Accordingly, we reject Puerto Rico's contention that there is an inconsistency in need of explanation.

-10-

data submitted by that date would be considered by HHS for purposes of determining completeness and reliability.  Id.  HHS has explained that this deadline is necessary to allow the Agency sufficient time to analyze the data and determine each state's entitlement to incentive payments.  See Child Support Enforcement Program; Incentive Payments, Audit Penalties, 65 Fed. Reg. 82,178, 82,184 (Dec. 27, 2000) (explaining, in preamble to final rule, that "[a] cut-off point [of December 31st] is necessary for us to make the required performance determinations and calculations on a timely basis").  That is, because incentive payments are allocated to each state as a percentage of a common pool of funds based on relative performance, 42 U.S.C. § 658a(b), the Agency cannot reasonably accommodate late submissions without delaying incentive payments to every eligible state.  Puerto Rico has not identified any evidence in the record that calls the Agency's explanation into question, nor has it offered any plausible interpretation of its own.  Under these circumstances, the Agency's decision to read its regulations as written was not plainly erroneous.

Alternatively, Puerto Rico argues that HHS acted in an arbitrary and capricious manner when it rejected the timely, but uncorrected, FY 2001 data covering the eighteenth-month period from January 1, 2000 to June 30, 2001.  Because the regulations provide that, in certain limited circumstances, the Secretary may excuse noncompliance with Title IV-D reporting requirements, Puerto Rico

-11-

argues that the Agency's decision to reject Puerto Rico's FY 2001 PEP data was an abuse of discretion. The regulation on which Puerto Rico relies provides that the Secretary may disregard a state's failure to submit complete and reliable data, and forgo the assessment of a penalty,

> if the Secretary determines that the incompleteness or unreliability of the data, or the noncompliance with one or more of the IV-D requirements, is of a technical nature which does not adversely affect the performance of the State's IV-D program or does not adversely affect the determination of the level of the State's paternity establishment or other performance measures percentages.

45 C.F.R. § 305.62. We agree with HHS that Puerto Rico's failure to comply with the FY 2001 PEP reporting requirements was not of a "technical nature" and, therefore, the Secretary had no discretion to accept Puerto Rico's submission. As the DAB reasonably found, any calculations based on eighteen months of data -- as opposed to the proper twelve month period -- would have skewed Puerto Rico's PEP rate upward for FY 2001 and thus would have "adversely affect[ed] the determination of the level of the State's paternity establishment." Under these circumstances, the Agency did not abuse its discretion when it rejected Puerto Rico's timely FY 2001 data due to the deficiencies identified above, or assessed a penalty based, in part, on that reporting failure.

## C. Notice

Next, Puerto Rico argues that the district court erred in concluding that HHS provided adequate notice of its assessment of the TANF penalty. It contends that HHS's interpretation of the applicable regulation does not give the state an opportunity to cure the deficiency, and is arbitrary and capricious because it frustrates Congress's intent to give states the chance to take corrective action and avoid the penalty. Puerto Rico emphasizes that it received notice of the penalty on November 14, 2003 -- thirteen months after the end of FY 2002 and, it asserts, too late to take corrective action.

HHS regulations provide that "[i]f a State is found by the Secretary to be subject to a penalty," then it must "notify the State in writing of such finding." 45 C.F.R. § 305.66(a). The notice must:

> (1) Explain the deficiency or deficiencies which result in the State being subject to a penalty, indicate the amount of the potential penalty, and give reasons for the finding; and

> (2) Specify that the penalty will be assessed in accordance with the provisions of 45 C.F.R. 262.1(b) through (e) and 262.7 if the State is found to have failed to correct the deficiency or deficiencies cited in the notice during the automatic corrective action year (i.e., the succeeding fiscal year following the year with respect to which the deficiency occurred.)

Id. § 305.66(b). HHS has consistently interpreted § 305.66 to require written notice of a penalty only after a state has "failed

-13-

to correct the deficiency or deficiencies . . . during the automatic corrective action year" and has been "found by the Secretary to be subject to a penalty." See <u>Ala. Dep't of Human Res.</u> v. <u>United States HHS</u>, 478 F. Supp. 2d 85, 89 (D.D.C. 2007); <u>Nevada</u>, No. 3:05-cv-00677, slip op. at 11.

By its plain terms, § 305.66(a) does not require HHS to give advance notice of its intent to assess a penalty in order to permit the state to take corrective action. Rather, the regulations contemplate that the Agency will notify the state "if" it determines that the state "is . . . subject to a penalty." 45 C.F.R. § 305.66(a). Thus, HHS was required to inform Puerto Rico of its intent to impose a penalty only <u>after</u> it determined that consecutive reporting and/or performance failures had occurred.

Puerto Rico contends that this interpretation deprives states of the opportunity to correct a deficiency before the assessment of a penalty. However, a state is not subject to a penalty until there have been performance and/or reporting deficiencies for two consecutive fiscal years. See 42 U.S.C. § 609(a)(8)(A); 45 C.F.R. § 305.61. States have an opportunity to cure deficiencies, and thus avoid a penalty, during the "corrective action year" which "automatic[ally]" follows the fiscal year in which the initial deficiency is found. 45 C.F.R. § 305.66(b)(2); see also 45 C.F.R. § 305.61 (providing that HHS may only impose penalty if, "[w]ith respect to the immediately succeeding fiscal

-14-

year, the State failed to take sufficient corrective action to achieve the appropriate performance levels or compliance or the data submitted by the State are still incomplete and unreliable"); Ala. Dep't of Human Res., 478 F. Supp. 2d at 89 ("[A] state is not subject to a penalty until after the end of the corrective action year which follows immediately and automatically upon a year of noncompliance.  Therefore, a penalty cannot be assessed and notice is not required, until after the end of, not prior to, the corrective action year.").

In this case, Puerto Rico was on notice that it could be subject to a penalty for FY 2002 PEP deficiencies by at least March 20, 2002, when HHS formally rejected the corrected FY 2001 PEP data.  Accordingly, we reject the contention that the Agency's interpretation of the § 305.66 notice provision is unreasonable because it prevents states from taking corrective action to avoid the imposition of a penalty.[6]

Puerto Rico also claims that the Agency's interpretation should be set aside because it has not been provided with an

_____

[6]  Indeed, the preamble to § 305.66 emphasizes that

> the State should not wait or rely upon the Secretary's determination of a data or a performance deficiency in order to begin corrective action.  Two consecutive years of failure (either poor data or poor performance) in the same performance measure criterion will trigger a penalty imposition.

Child Support Enforcement Program; Incentive Payments, Audit Penalties, 65 Fed. Reg. at 82,192.

-15-

opportunity to propose and implement a corrective compliance plan, a procedure available to states before HHS imposes a penalty under other TANF provisions not at issue in this appeal. See 42 U.S.C. § 609(c). However, as Puerto Rico acknowledges, the statute on which it relies for this contention expressly provides that the opportunity to propose and implement such corrective compliance plans "shall not apply" to a penalty, like that at issue here, assessed for PEP deficiencies pursuant to § 609(a)(8). Id. § 609 (c)(4).

Finally, Puerto Rico asserts, without developed argument, that "horn book" law and principles of due process prevent the imposition of a penalty without adequate prior notice. We deem these arguments waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Thus, we conclude that the Agency's interpretation of the notice provision is reasonable, and entitled to deference. See Thomas Jefferson Univ., 512 U.S. at 512.

**Affirmed**.