**NATIONAL ASSOCIATION FOR HOME CARE, Plaintiff,**

v.

**Donna SHALALA, Defendant.**

**No. CIV.A.98–0908 (EGS).**

United States District Court, District of Columbia.

Feb. 26, 2001.

Stanley M. Brand, Brand & Frulla, Washington, DC, William Alexander Dombi, Center for Health Care law, Washington, DC, for plaintiff.

Carol Federighi, U.S. Department of Justice, Civil Division, Federal Program Branch, Washington, DC, for defendant.

### MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

## I. Introduction

Plaintiff National Association for Home Care (NAHC) is an organization comprised of home health care agencies located throughout the United States. Defendant Department of Health and Human Services (HHS) is the federal agency charged with administering Medicare. NAHC alleges that HHS has contravened the Regulatory Flexibility Act (RFA) in its promulgation of a 1997 rule concerning reimbursement of Medicare-certified home health care agencies. Plaintiff asks that the case be remanded to HHS so that the agency can redo its RFA analysis. Upon consideration of defendant's motion to dismiss the second amended complaint, or, in

the alternative, for summary judgment, plaintiff's cross motion for summary judgment, and all responsive pleadings related to these motions, the Court holds that there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law. Accordingly, defendant's motion for summary judgment [27–1] [27–2] is **GRANTED** and plaintiff's cross motion for summary judgment [32–1] is **DENIED.**

## II. Statutory Background

Medicare,[1] the complex statutory and regulatory program that provides health care for elderly and disabled Americans, is administered by the Department of Health and Human Services through the Health Care Financing Administration (HCFA). *See* 42 U.S.C. §§ 1395c, 1395d. Many Medicare beneficiaries receive outpatient treatment under the supervision of home health care agencies. These patients have varied medical needs ranging from short-term care to long-term care, from infrequent check-ups to frequent visits. Pursuant to written participation contracts between HCFA and the home health agencies (HHA), the agencies furnish specified health services to Medicare beneficiaries, and HCFA reimburses the agencies in accordance with the Medicare Act and its regulations. 42 U.S.C. §§ 1395c, 1395d, 1395cc.

Prior to the Balanced Budget Act of 1997(BBA), Pub.L. 105–33, Medicare paid home health care agencies on a retrospective cost basis; that is, home health care agencies were reimbursed after services had been rendered. Medicare paid home

health care agencies the lesser of the actual "reasonable costs"[2] they incurred, or the maximum per-visit cost determined by the Medicare Act. See 42 U.S.C. §§ 1395x(v)(1)(A), (L). Overpayments and underpayments were corrected retroactively. 42 C.F.R. § 413.60(c).

With the BBA, Congress modified this payment system to control costs and reduce fraud in the home health care system. Pub.L. No. 105–33, §§ 4602 & 4603. The BBA directed that, effective October 1, 1999, home health care agencies would be paid under a prospective payment system (PPS) similar to that used for other Medicare providers, such as hospitals. 42 U.S.C. § 1395ff(a), (b). Under the PPS, Medicare providers receive predetermined payments intended to cover each patient's individual medical needs.

In addition to reducing fraud in the long term, Congress aimed to realize immediate savings until the implementation of the PPS. To that end, the BBA required HCFA to establish an Interim Payment System (IPS). 42 U.S.C. § 1395x(v)(1)(L). Under the IPS, home health care agencies were to be paid for cost reporting periods beginning on or after October 1, 1997, based on the lowest of three calculations:

1) the home health care agencies' actual reasonable allowable costs;

2) a revised aggregate per-visit limit not to exceed 105% of the median per-visit costs;

3) a new aggregate per-beneficiary limit.

42 U.S.C. § 1395x(v)(1)(L).

---

1. Medicare was established in 1965 by Title XVIII of the Social Security Act, Title 42 U.S.C. § 1395 *et seq.*

2. The Medicare Act defines "reasonable cost" generally as "the cost actually incurred, excluding therefrom any part of incurred cost

found to be unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Those costs that exceeded the maximum per-visit cost as determined under the Act were "not recognized as reasonable." 42 U.S.C. § 1395x(v)(1)(L)(i), (ii).

The per visit and per beneficiary limitations are calculated in the aggregate for each HHA. In other words, an individual beneficiary's number of visits is not limited, but the HHA's total reimbursement for all patients is capped. *See, e.g.,* 42 U.S.C. § 1395x(v)(1)(L)(ii).

Congress intended to reduce the total annual payments for treating patients under the IPS. For example, while the per-visit cost limits used to be calculated at 112% of the mean of the labor-related and non-labor per-visit costs for freestanding home health agencies, the IPS lowered the limit to 105% of the median of such costs. *See* 42 U.S.C. § 1395x(v)(1)(L)(i)(I), (IV).

While the reasonable cost and per-visit limitations already existed under prior law, the per beneficiary limitation is new. To implement the IPS, HCFA promulgated revised per visit cost limits on January 2, 1998. *See* 63 Fed.Reg. 89, 92–3 (1998). On March 31, 1998, HCFA propounded the new maximum per beneficiary limits. *See* 63 Fed.Reg. 15,717 (1998). Both of these limits were effective retroactively to October 1, 1997. Plaintiffs contend that HHS failed to satisfy the requirements of the RFA when it issued these regulations. Defendants oppose, arguing that they did not have to comply with RFA analysis requirements because the provisions implementing the IPS and PPS qualified as interpretive rules.

## III. Discussion

### A. *Regulatory Flexibility Act*

#### 1. *Purposes*

The Regulatory Flexibility Act (RFA), enacted in 1980, arose from the concern that small businesses may be forced to bear an unnecessary or disproportionate burden when the federal government issues regulations. *See generally* Doris S. Freedman, et al., *The Regulatory Flexibil-* *ity Act: Orienting Federal Regulation to Small Business,* 93 Dick. L.Rev. 439, 440 (Spr.1989). The goals of the RFA are:

> [F]irst, to increase federal agency awareness and understanding of the impact of regulations on small entities by requiring agencies to identify and explain those impacts; second, to require agencies to communicate and explain their findings to the public, including notification beyond the traditional notice requirement of the APA; third, to analyze alternatives available to small entities in order to minimize impact on those entities; and finally, to provide regulatory relief for small entities. 5 U.S.C. § 601 (note: Congressional Findings and Declaration of Purpose).

It is clear, then, that the RFA was meant to provide protection to small businesses that might be caught in the crosshairs of federal regulations.

#### 2. *Relevant Provisions*

To effect that protection, the RFA provides that whenever an agency is required by the Administrative Procedure Act (APA), 5 U.S.C. § 553, or any other law, to publish a notice of proposed rulemaking, it must prepare and make available for public comment an initial regulatory flexibility analysis (IRFA). *See* 5 U.S.C. § 603. When an agency promulgates a final rule, after being required either by the APA or another law to publish a general notice of proposed rulemaking, it must also prepare a final regulatory flexibility analysis (FRFA). The IRFA and FRFA must include, among other things, a statement concerning the impact of the rule on small entities. *See* 5 U.S.C. §§ 603(a), 604(a)(3). In addition, the IRFA must "contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic

impact of the proposed rule on small entities." *Id.* at § 603(c). The FRFA must contain:

> (5) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives ... was rejected. 5 U.S.C. § 604(a)(5).

However, the FRFA requirement does not apply if the head of the agency certifies that the rule "will not...have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). In addition, interpretive rules, because they are exempted from the APA's notice and comment procedures, are exempted from the RFA's strictures as well.[3] The RFA's legislative history confirms this second exception. In passing the original RFA, Congress stated that:

> [s]ome statutes ... place explicit limitations on agency discretion in rulemaking. If uniform requirements are mandated by statutes, a statement to that effect would obviate the need to solicit or consider proposals which include differing compliance standards. S.Rep. No. 96–878 at 13 (1980), reprinted in 1980 U.S.C.C.A.N. 2788, 2800.

Unless one of these exceptions applies, an agency promulgating a final rule that will have a "significant economic impact on a substantial number of small entities" must perform a proper RFA analysis. 5 U.S.C. § 605(b).

The Small Business Regulatory Enforcement Fairness Act, Pub.L. No. 104–121, tit. II (1996)(SBREFA), the 1996 amendment to the RFA, sharpens the RFA's teeth by bolstering its enforceability. *See generally Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 111–14 (1st Cir.1997) (detailing purpose and legislative history of the RFA). Pursuant to SBREFA, small entities adversely affected or aggrieved by a final agency action are entitled to judicial review of agency compliance with the requirements of the above-discussed § 604, as well as other sections. 5 U.S.C. § 611(a)(1). In granting relief in an RFA action, the court must order the agency to take corrective action consistent with chapters 6 and 7 of volume 5 of the U.S.Code. Chapter 6 provides that corrective action may include a) remanding the rule to the agency, and b) deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest, 5 U.S.C. § 611(a)(4). Chapter 7 includes the scope of review provision of 5 U.S.C. § 706(2).[4]

Plaintiffs allege that HHS violated § 604(a)(5) of the RFA when it issued both the January 2, 1998, regulation for the

---

**3.** 5 U.S.C. § 553(b)(A) of the APA provides that its notice and written comment requirement does not apply to interpretive rules.

**4.** That section provides:
> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall...

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ...
>> (D) without observance of procedure required by law.
> 5 U.S.C. § 706(2)(A),(D).

revised per-visit limits of the IPS and the March 31, 1998, regulation for the new per-beneficiary limit of the IPS. Plaintiffs base their argument on the absence from both regulations of any examination of alternatives to the adopted rule.[5]

Defendant does not deny that the regulations did not include searching examination of all the alternatives to the final rules. Defendant argues they were not required to examine alternatives to the proposed rules because the BBA did not grant the Secretary of HHS any discretion in implementing the IPS. Defendant contends that Congress delineated its objectives so exactly that no significant alternatives exist, and therefore, no meaningful RFA analysis can or need be conducted.

### B. *Whether the Regulatory Flexibility Act Applies*

■ In *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037 (D.C.Cir.1987), the D.C. Circuit distinguished an interpretive rule from a substantive one:

Substantive rules are ones which "grant rights, impose obligations, or produce other significant effects on private interests," *see Batterton*, 648 F.2d at 701–02 (citations omitted), or which "effect a change in existing law or policy." *See Alcaraz*, 746 F.2d at 613 (quoting *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983)). Interpretive rules, by contrast, "are those which merely clarify or explain existing law or regulations," *Alcaraz*, 746 F.2d at 613 (quoting *Powderly*, 704 F.2d at 1098), are "essentially hortatory and instructional," *Alcaraz*,

746 F.2d at 613, and "do not have the full force and effect of a substantive rule but [are] in the form of an explanation of particular terms." *Gibson*, 194 F.2d at 331. *Bowen*, 834 F.2d at 1045.

The *Bowen* court went on to state that whether a particular agency action is interpretive or substantive is an ad hoc determination. *See id.* The court listed some of the distinguishing characteristics of interpretive rules, including that an interpretive rule merely reminds parties of existing duties; that whether a rule may have a substantial impact is not dispositive; and that interpretive rules and their implementing regulations "merely track[ ]" each other, because the regulations simply explain the requirements of the statute. *Id.* at 1046.

The BBA's directives concerning implementation of the IPS are extremely specific. For example, in § 4602(c) of the BBA, Congress set the mathematical formula for determining the new per beneficiary limits. *See* Pub.L. No. 105–33, § 4602(c), codified at 42 U.S.C. § 1395x(v)(1)(L)(v)(I). Congress also mandated that, for beneficiaries who use services furnished by more than one home health agency, the per beneficiary limitations "shall" be prorated among the agencies. *See* Pub.L. No. 105–33, § 4602(c), codified at 42 U.S.C. § 1395x(v)(1)(L)(vi)(II). In addition, Congress ordered the Secretary not to recognize as reasonable agency costs that exceed for cost reporting periods beginning on or after—

---

**5.** The January 2, 1998, regulation states:

[t]his notice is necessary to implement the provisions of [42 U.S.C. § 1395x(v)(1)(L) ] as amended by BBA '97, these alternatives to the provisions set forth in this notice are not available. 63 Fed.Reg. 89, 103 (1998). Similarly, the March 31, 1998, regulation, states:

We have examined the options for lessening the burden on small entities, however, the statute does not allow for any exceptions to the aggregate per-beneficiary limitation based on size of entity. Therefore, we are unable to provide any regulatory relief for small entities, 63 Fed.Reg. 15,717, 15,734 (1998).

(I) July 1, 1985, and before July 1, 1986, 120 percent of the mean of the labor-related and nonlabor per visit costs for freestanding home health agencies,

(II) July 1, 1986, and before July 1, 1987, 115 percent of such mean,

(III) July 1, 1987, and before October 1, 1997, 112 percent of such mean,

(IV) October 1, 1997, and before October 1, 1998, 105 percent of the median of the labor-related and nonlabor per visit costs for freestanding home health agencies, or

(V) October 1, 1998, 106 percent of such median, 42 U.S.C. § 1395x(v)(1)(L)(i)(I)-(V).

Because of the remarkable specificity of the BBA's provisions, this Court is persuaded that Congress had a very precise idea of what the BBA would accomplish, and that the BBA is an interpretive rule. Accordingly, because this Court finds that the BBA is an interpretive rule, the RFA does not apply Therefore, there is no genuine issue of material fact, and defendant must prevail on summary judgment. *See* Fed.R.Civ.P. 56.

### C. *Standard of Review*

Having determined that the BBA is an interpretive rule, the Court turns its attention to defendant's alternative argument that, even if HHS did have a modicum of discretion, it wielded that discretion within the bounds of its authority. The parties clash over the standard of review to be applied to examination of the five specific areas in which plaintiff charges that defendant had discretion.

### 1. *Defendant's Standard of Review: APA "Arbitrary and Capricious"*

Defendant avers that the APA's arbitrary and capricious standard is the applicable standard of review for determination of whether an agency has complied with the RFA. Two federal circuit courts have ruled on this question. The first and more instructive was the First Circuit in *Associated Fisheries of Maine v. Daley*, 127 F.3d 104 (1st Cir.1997).[6] Associated Fisheries of Maine (AFM) initiated this challenge to implementation of amendments to a fishery plan that set harvesting limits of certain species of fish. AFM argued that the fishery plan's amendments constituted a severe economic hardship that could destroy the fishing business. In attempting to protect the interests of the small fishing businesses, AFM argued that the amendments should be held invalid for being "arbitrary and capricious" and for failing to meet the standards of SBREFA. Since SBREFA took effect after the issuance of the fishery rule, the Court ruled that judicial review did not apply to these actions. However, the First Circuit nonetheless analyzed the agency's compliance with the RFA. On the merits, the First Circuit held that the Secretary of Commerce complied with the requirements of the RFA, and the amendments to the fishery plan were valid. The First Circuit applied a "reasonableness" standard:

> The point is not whether the Secretary's judgments are beyond reproach, but whether he made a reasonable, good-faith effort to canvass major options and weigh their probable effects. Here, the record reveals that the Secretary explicitly considered numerous alternatives, exhibited a fair degree of sensitivity con-

---

**6.** The second was the Fifth Circuit in *Alenco Communications, Inc., et al. v. Federal Communications Comm'n,* 201 F.3d 608, 625 (5th Cir.2000). The Fifth Circuit simply adopted the First Circuit's standard of review determining whether the agency has made a "reasonable, good faith effort" to comply with the RFA.

cerning the need to alleviate the regulatory burden on small entities within the fishing industry, adopted some salutary measures designed to ease that burden, and satisfactorily explained his reasons for rejecting others. *Associated Fisheries,* 127 F.3d at 116.

Accordingly, defendants advocate for this Court to adopt the First Circuit's reasonableness standard, with its great degree of deference.

Since *Associated Fisheries,* several district courts have addressed the question of the proper standard of review under the RFA and adopted the First Circuit's holding.[7] However, the case most factually and procedurally similar to the present case is *Greater Dallas Home Care Alliance v. Shalala,* 36 F.Supp.2d 765 (N.D.Tx. 1999). The *Greater Dallas* court considered the same question now at issue: whether HHS complied with the RFA in its promulgation of the 1997 BBA. HHS concluded that the rule would have a significant impact on small entities, and so an RFA analysis would regularly be required; but, HHS argued, the promulgation of the rule fell outside the RFA's purview, because it was only interpretive. In other words, Congress had legislated the rule so meticulously as to preclude any exercise of agency discretion, and so an RFA analysis would be an exercise in futility. The court agreed that Congress had legislated "with remarkable detail." *id.* at 769, that the agency had no discretion, and that the RFA therefore did not apply to promulgation of the BBA home health care rules.

In dicta giving a nod to the First Circuit, the court determined that the APA arbitrary and capricious standard applied, and further stated that it was "of the opinion that HHS did not act arbitrarily and capriciously." *Id.* at 770.

### 2. *Plaintiff's Standard of Review: Chevron*

Plaintiff instead suggests the now familiar *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), two-step inquiry. *Chevron* provides that review of agency conduct proceed as follows:

Under step one, where "Congress has directly spoken to the precise question at issue," [reviewing courts] must "give effect to the unambiguously expressed intent of Congress," reversing an agency's interpretation that does not conform to the statute's plain meaning. Under step two, which addresses situations in which the statute is either silent or ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." We reverse only if the agency's construction is "arbitrary, capricious or manifestly contrary to the statute." If, on the other hand, the interpretation "is based on a permissible construction of the statute," we defer to the agency's construction. *Alenco Communications, Inc., et al. v. Federal Communications Comm'n,* 201 F.3d 608, 619 (5th Cir. 2000) (citations omitted).

---

**7.** *See, e.g., Southern Offshore Fishing Ass'n v. Daley,* 995 F.Supp. 1411, 1433–37 (M.D.Fla. 1998) (holding that where the Secretary certified that the fishery management plan (FMP) for sharks would have "no significant impact" on small businesses, the Court should review the Secretary's RFA .compliance under arbitrary and capricious review, and remanding to the Secretary for consideration of econom-

ic effects and potential alternatives to the promulgated rule); *see also, North Carolina Fisheries Ass'n v. Daley,* 27 F.Supp.2d 650, 658–9 (E.D.Va.1998) (subjecting steps Secretary had taken after a prior remand of the FMP for flounders to arbitrary and capricious review and finding that the Secretary's economic analysis was "utterly lacking in compliance with the requirements of the RFA.")

Plaintiffs propose that the step one inquiry should check HHS's conclusion that the BBA is merely interpretive, and that the step two inquiry should review the agency's actual consideration and/or choice of alternatives.

Plaintiff claims that Congress has, in fact, "directly spoken to the precise question" of whether the RFA should be applied in this circumstance. Plaintiff points to the House Statement of RFA Issues, which directs that "[t]he legislation is intended to be as inclusive as possible, and doubts about its applicability should be resolved in favor of complying with the provisions of the Act." 126 Cong. Rec. H24589 (Sep. 8, 1980). Plaintiffs argue that not only does this statement support their two-tiered standard of review, it also resolves this case in their favor, since they are asking only that defendant conduct an RFA analysis

Defendant opposes on the ground that plaintiffs have taken that statement out of context. Defendant argues that that statement refers not to the determination of whether significant alternatives exist but to the determination of whether a regulation has a "significant impact on a substantial number of small entities." Here, defendant found unequivocally that the amendments would significantly impact a great number of small entities.

Examining the passage, it seems that plaintiffs are correct in their interpretation of the meaning of that statement. The surrounding language is:

> The initial decision the agency makes is a determination that the provisions of the Act are applicable to the agency and to the actions that it takes. This is clearly an important decision, which the agency should consider very seriously.

The legislation is intended to be as inclusive as possible, and doubts about its applicability should be resolved in favor of complying with the provisions of the Act. Any significant comments from the public or especially the Office of Advocacy that a rulemaking should be accompanied by a regulatory flexibility analysis should be given the utmost serious consideration by an agency. 126 Cong. Rec. H24589 (Sep. 8, 1980)

The statement's context clearly shows that Congress intended that agencies err on the side of caution in determining whether to perform regulatory flexibility analyses.

### 3. Standard of Review

Because the weight of precedent clearly supports defendant's position, this Court is persuaded the APA arbitrary and capricious review should be applied in this case.[8]

### D. Arbitrary and Capricious Review

■ Although APA arbitrary and capricious review is narrow and deferential, it is not a rubber stamp. See Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) The agency must comply with regulatory requirements and offer a satisfactory explanation for its action. See id. In reviewing that explanation, a court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The reviewing court should not attempt itself to make up for any deficiencies in the agency's analysis or

8. However, this Court is careful to note that plaintiff's argument spotlights the fact that Congress meant for agencies to err on the side of performing RFA analyses too often rather than too seldom.

consideration of a given regulation. *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) However, the agency is accorded a great deal of deference, as the court will "uphold a decision of less than ideal clarity" as long as "the agency's path may reasonably be discerned." *Bowman Transportation, Inc.*, 419 U.S. at 286, 95 S.Ct. 438.

Adhering to this deferential standard of review, the Court is convinced that HHS did not act arbitrarily and capriciously. Plaintiff cites five areas to support its argument that defendant was not handed a gapless statutory scheme: determining the median for "new" agencies, prorata sharing, applicability of the market basket update, lack of exceptions to the per beneficiary limitation, and treatment of branch/subunit conversions. The agency has given the requisite consideration to these factors, and, since defendant has merely followed Congress's mandate, its "path may reasonably be discerned."

## 1. *Median for "New" Agencies*

The parties' central dispute concerns whether the statutory language mandates that the limits for "new providers" be based upon a single national median or several regional medians. Section 4602(c) of the BBA, codified at 42 U.S.C. § 1395x(v)(1)(L)(vi)(I), provides:

(I) For new providers and those providers without a 12–month cost reporting period ending in fiscal year 1994, subject to clauses (viii)(II) and (viii)(III) **the per beneficiary limitation shall be equal to the median of these limits (or the Secretary's best estimates thereof)** applied to other home health agencies as determined by the Secretary. A home health agency that has altered its corporate structure or name shall not be considered a new provider for this purpose.

42 U.S.C.A. § 1395x(v)(1)(L)(vi)(I) (emphasis added)

In the March 31, 1998 rule, defendant determined that this statutory language directed the Secretary to calculate the per beneficiary limitation using the median of all the limits applied to all HHAs nationally, and not just the median of the limits applied in the new HHAs' own regions. 63 Fed.Reg. at 15,723. Plaintiff relies on several textual arguments to counter that Congress intended the per beneficiary limitations to be based on regional medians.

### a. *Statutory Support*

Defendant offers several reasons why plaintiff's assertions must fail for lack of statutory support. First, defendant highlights that the provision governing limits for new providers makes no reference to use of regional medians. *See* 42 U.S.C. § 1395x(v)(1)(L)(vi)(I). Then, defendant juxtaposes this omission with the provision governing limits for old providers, where Congress expressly indicated that a regional number be used in the calculation. *See* 42 U.S.C.A. § 1395x(v)(1)(L)(v)(I)(instructing that 25 percent of the limit was to be based on "98 percent of the standardized regional average of such costs for the agency's census division"). When Congress includes language in one section of a statute but omits it from another section of the same statute, the omission is presumed to be intentional. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Here, defendant argues. Congress's explicit provision for the use of regional numbers in one instance and not in the other evinces its intent to apply a national median to new providers.

In response to defendant's argument by omission, plaintiff observes that defendant's conclusion that the BBA requires a national median is conspicuously absent from the text of the Act. Both plaintiff and the SBA observe that promulgating a na-

tional median is not mentioned as a goal of the BBA even once in the entire statute.

This Court is persuaded by defendant's argument by omission. It is very compelling that Congress included language concerning use of regional medians in the provision dealing with old agencies but not in the provision dealing with new agencies. Accordingly, this Court finds that defendant's interpretation that the BBA mandates use of a national median is neither arbitrary nor capricious.

b. *"The Median of These Limits"*

In addition, defendant offers a textual argument in support of its conclusion. Section 4602(c) of the BBA, codified at 42 U.S.C. § 1395x(v)(1)(L)(vi)(I), provides:

> (I) For new providers and those providers without a 12–month cost reporting period ending in fiscal year 1994, subject to clauses (viii)(II) and (viii)(III) **the per beneficiary limitation shall be equal to the median of these limits (or the Secretary's best estimates thereof)** applied to other home health agencies as determined by the Secretary. A home health agency that has altered its corporate structure or name shall not be considered a new provider for this purpose. 42 U.S.C.A. § 1395x(v)(1)(L)(vi)(I) (emphasis added).

In its August 11, 1998 notice, HCFA observed that the statutory language refers to "the median," not "the medians," and "clearly contemplat[ed] the use of a single, and therefore, national median" for new providers, instead of "several medians, which would be the case if the statute required the regional system suggested by commentators." 63 Fed.Reg. at 42, 917–18.

In response, plaintiff maintains that several textual cues in §§ 4602 and 4603 of the BBA undermine defendant's contention that Congress intended to regulate

new home health care agencies with a national median, and not with regional medians. Plaintiff zooms in on the same language defendant focuses on: "the per beneficiary limitation shall be equal to the median of these limits (or the Secretary's best estimates thereof) applied to other home health agencies as determined by the Secretary." 42 U.S.C.A. § 1395x(v)(1)(L)(vi)(I). Plaintiff argues that the "limits" in this section are first mentioned in the section directly preceding, 42 U.S.C.A. § 1395x(v)(1)(L)(v)(I). That section provides that the per beneficiary limitation for old agencies will be calculated according to the following formula:

> (I) an agency-specific per beneficiary annual limitation calculated based 75 percent on 98 percent of the reasonable costs (including nonroutine medical supplies) for the agency's 12–month cost reporting period ending during fiscal year 1994, and based 25 percent on 98 percent of the **standardized regional average** of such costs for the agency's census division, as applied to such agency, for cost reporting periods ending during fiscal year 1994, such costs updated by the home health market basket index. 42 U.S.C.A. § 1395x(v)(1)(L)(v)(I) (emphasis added).

Here, plaintiff tries to turn defendant's argument by omission on its head. Because Congress ordered the use of "standardized regional average[s]" to calculate the per beneficiary limit in (v), plaintiff argues, the "median of these limits" in (vi) must refer to a reimbursement system based on agency-specific data and region-specific data—not on a national median.

Reading the plain language of the statute, the Court is convinced that defendant's interpretation is the more reasonable of the two. Section 1395x(v)(1)(L)(v)(I) very clearly applies to

old agencies; section 1395x(v)(1)(L)(vi)(I) very clearly applies to new agencies. This very deliberate separation in the statute makes plain that the "standardized regional average[s]" cannot apply to the calculation of the per beneficiary limitation for new agencies. In addition, defendant considered comments concerning this point, and rejected them, in its August 11 notice. *See* 63 Fed.Reg. at 42, 917. Accordingly, this Court holds that defendant's interpretation is not arbitrary and capricious.

c. *"Or the Secretary's Best Estimates Thereof"*

Finally, plaintiff argues that HHS's discretion in implementing the statute is apparent in the phrase "or the Secretary's best estimates thereof." Plaintiff contends that the fact that the word "estimates" is plural indicates that the "median" to be applied to new agencies was intended to mean several regional medians. Plaintiff further avers that the fact that "estimates" is modified by the word "best," which, because it is the superlative form, necessarily indicates a choice, also demonstrates that the "median" to be applied to new agencies was intended to mean several regional medians.

As for plaintiff's interpretation of "the best estimates thereof," defendant responds that the word "estimates" modifies "limits," not "median," and therefore evinces no support for the argument that defendant had discretion in determining the per-beneficiary limitation.

This Court is persuaded that the government's choices in interpreting this section of 42 U.S.C. § 1395x(v)(1)(L)(vi)(I),

given the plain language of the statute, are reasonable, and not arbitrary and capricious.

2. *Prorata Sharing*

Plaintiff avers that further evidence of defendant's discretion is defendant's inconsistent interpretation of the word "beneficiary" in the two provisions governing calculation of the payment limits and the application of the proration provision. Section 4602(c) allows for the computation of a "per beneficiary annual limitation" to be applied in the aggregate to the "agency's unduplicated census count of patients . . . for the cost reporting period subject to the limitation." 42 U.S.C. § 1395x(v)(1)(L)(v)(II). In the provisions governing proration, § 4602(c) instructs that "[f]or beneficiaries who use services furnished by more than one home health agency, the per beneficiary limitations shall be prorated among the agencies." 42 U.S.C. § 1395x(v)(1)(L)(vi)(II).[9] Plaintiff argues that, under defendant's interpretation, a "beneficiary" is calculated one way in the census count used to figure the limit and another way in the census count used to apply the limit. With respect to the calculation of the per beneficiary annual limitation under clause (v), plaintiff argues that defendant has considered a beneficiary to represent a whole number in the census count irrespective of whether the beneficiary received services from more than one agency. However, for the clause (vi) proration provision, the same beneficiary is counted as a fraction in the census count that beneficiary received services from more than one agency. As a result, plaintiff argues, defendant has assigned

---

**9.** Defendant offered the following illustrative example:

> If an HHA furnished 100 visits to an individual beneficiary during its cost reporting period ending September 30, 1998 and that same individual received a total of 400 vis-

its during the same period, the HHA would count the beneficiary as a .25 unduplicated census count of Medicare patient for the cost reporting period ending September 30, 1998. 63 Fed.Reg. at 15, 727.

"beneficiary" two conflicting meanings. Plaintiff points to this conflicting definition as proof of defendant's discretion. *See* Pl.'s Reply Mem. to Def.'s Opp'n to Pl.'s Cross–Mot. for Summ. J. at 15.

Defendant specifically rejects this construction in its August 11 notice. Public comments requested that the requirement to prorate the unduplicated census count of Medicare beneficiaries when a beneficiary is serviced by more than one HHA for cost reporting periods beginning on or after October 1, 1997 be applied in determining the unduplicated census count of Medicare beneficiaries for cost reporting periods ending during FY 1994. In response, HCFA stated that "the statute does not provide for this." It further determined that this provision is specific for services furnished by HHAs for cost reporting periods on or after October 1, 1997. The Court is persuaded that defendant's interpretation is true to the statutory language, and not arbitrary and capricious.

### 3. *Market Basket Update: 42 U.S.C. § 1395x(v)(1)(L)(iv) and 42 U.S.C. § 1395x(v)(1)(L)(v)(I)*

The parties clash over the extent to which changes in the home health market basket index should be incorporated into the computation of the per beneficiary limits. Their dispute implicates two sections of the BBA. At § 4602(c), codified at 42 U.S.C. § 1395x(v)(1)(L)(v)(I), the BBA provides that an old agency's per beneficiary limit must be based on 75 percent of the agency's reasonable costs for the cost-reporting period ending in fiscal year 1994, and 25 percent on the regional average of the agency's reasonable costs for the cost-reporting period ending in fiscal year 1995. Section 4602(c) further provides that the 1994 base-year costs must be "updated by the home health basket index." *Id.* Section 42 U.S.C. § 1395x(v)(1)(L)(iv), further instructs:

> (iv) In establishing limits under this subparagraph for cost reporting periods beginning after September 30, 1997, **the Secretary shall not take into account any changes in the home health market basket, as determined by the Secretary, with respect to cost reporting periods which began on or after July 1, 1994, and before July 1, 1996.** 42 U.S.C. § 1395x(v)(1)(L)(iv) (emphasis added).

In its March 31, 1998 rule, defendant interpreted this provision as mandating the Secretary to exclude changes in the home health market basket index occurring between July 1, 1994 and July 1, 1996 from computation of the new per beneficiary limits. *See* 63 Fed.Reg. at 15, 719. Plaintiff argues that defendant's interpretation is incorrect, and that defendant failed to consider a viable alternative interpretation.

Under defendant's interpretation, both the per visit and the per beneficiary limits are updated using the home health market basket index changes from July 1, 1996 to the present, but not using changes occurring between July 1, 1994 and July 1, 1996. *Id.* at 15, 727. Defendant based this interpretation on language from the two sections indicating, in plain language, that "the Secretary shall not take into account any changes in the home health market basket, as determined by the Secretary, with respect to cost reporting periods which began on or after July 1, 1994, and before July 1, 1996" in establishing limits under "this subparagraph." 42 U.S.C. § 1395x(v)(1)(L)(iv). The limits explained under "this subparagraph," subparagraph 1395x(v)(1)(L), include both the per visit limits, defined at 42 U.S.C. § 1395x(v)(1)(L)(ii), and the per beneficiary limits, defined at 42 U.S.C. § 1395x(v)(1)(L)(v)(I). Accordingly, defen-

dant maintains, this language clearly applies to both the per visit and per beneficiary limits.

Plaintiff counters that the statutory language limits application of the freeze to inflation for the 1994–1996 period to per visit limits. Under 42 U.S.C. § 1395x(v)(1)(L)(v), the per beneficiary limit applies only if it is lower than limits established "under the preceding provisions of this subparagraph." Plaintiff points out that the per visit cost limits, and not the per beneficiary limits, precede this subparagraph, which plaintiff defines as subparagraph 1395x(v)(1)(L)(v). Plaintiff continues that the per beneficiary limitation provision has its own discrete and express reference to home health market basket index updates without the restriction set out in subparagraph (iv):

> (v) For services furnished by home health agencies for cost reporting periods beginning on or after October 1, 1997, subject to clause (viii)(I), the Secretary shall provide for an interim system of limits. Payment shall not exceed the costs determined under the preceding provisions of this subparagraph or, if lower, the product of—
>
>> (I) an agency-specific per beneficiary annual limitation ... **such costs updated by the home health market basket index.** 42 U.S.C.A.

§ 1395x(v)(1)(L)(v)(I) (emphasis added).

Plaintiff argues that this language expressly mandates the inclusion of health market basket index changes in the computation of the per beneficiary limits. Therefore, plaintiff argues, defendant's exclusion of home health market basket index fluctuations between July 1, 1994 and July 1, 1996 at worst violates the statutory mandate, and at best creates an ambiguity that should be resolved through reference to legislative history and remand to the agency for further RFA analysis.[10]

For several reasons, this Court is persuaded that defendant's interpretation survives arbitrary and capricious review. Defendant duly considered and rejected plaintiff's alternative interpretation in its August 11 notice. *See* 63 Fed.Reg. 42, 917. Furthermore, defendant's reading is faithful to the plain language of the statute. In addition, plaintiff's argument also allows room for defendant's interpretation. The per-beneficiary-specific language on which plaintiff relies, "... such costs updated by the home health market basket index," 42 U.S.C.A. § 1395x(v)(1)(L)(v)(I), is not mutually exclusive from defendant's interpretation, since defendant has interpreted the statute to order the Secretary to update the per beneficiary limitations the home health market basket index

---

**10.** Plaintiff's legislative intent argument is complex. Section 4601 of the BBA was intended to "capture the savings stream resulting from the Omnibus Budget Reconciliation Act of 1993 [(OBRA '93)] freeze on home health limits by not allowing the market basket update to the limits that occurred during the cost reporting periods of July 1, 1994 through June 30, 1996." H.R. 105–217, Conf. Committee Explanation of BBA of 1997, 105th Cong., 2nd Sess., p. 124b; *see also* Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. and Opp'n Mem. to Def.'s Mot. to Dismiss at 31–32. In other words, Congress clearly intended to capitalize on the savings resulting from

the freeze on per visit cost limits during that two-year window. But, plaintiff argues, it does not make sense that Congress would attempt to "capture" these savings through the per beneficiary annual limitation, because that limitation did not exist during the freeze. *Id.*

This Court is not persuaded by plaintiff's argument, because the plain language of the statute favors defendant's position. In addition, even if plaintiff is correct regarding congressional intent, the plain language of the statute controls. *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992).

changes from July 1, 1996 to the present. This Court is persuaded that defendant's interpretation of 42 U.S.C. § 1395x(v)(1)(L)(v)(I) and the exclusion of home health market basket updates from the calculations of per beneficiary limitations is not arbitrary and capricious.

### 4. *Lack of Exceptions to the Per Beneficiary Annual Limitation*

Plaintiff challenges defendant's conclusion that the BBA forecloses any opportunities for HHAs to apply for exceptions to or exemptions from the per-beneficiary cost limitations. *See* Sec. Am. Compl. ¶¶ 51–52; 63 Fed.Reg. at 15, 725. Under the pre-BBA Medicare reimbursement structure, Congress had explicitly provided the Secretary the discretion to allow exemptions and exceptions from the per visit limits. Plaintiff argues that, although the BBA itself does not provide for any exceptions to the new per beneficiary limit, the preexisting § 1395x(v)(1)(L)(ii) can be interpreted to continue to allow such exceptions. Section 1395x(v)(1)(L)(ii) provides:

> (ii) Effective for cost reporting periods beginning on or after July 1, 1986, such limitations shall be applied on an aggregate basis for the agency, rather than on a discipline specific basis.[11] The Secretary may provide for such exemptions and exceptions to such limitation as he deems appropriate. 42 U.S.C. 1395x(v)(1)(L)(ii).

Plaintiff contends that the reference to "such limitations" can be interpreted to mean either per visit limits, or per beneficiary limits, or both, since both are applied in the aggregate under the BBA. In other words, substituting plaintiff's suggested meaning, the statute allows the Secretary to "provide for such exemptions and such exceptions" to the per visit and per beneficiary limits "as he deems appropriate." Therefore, plaintiff maintains, defendant's refusal to allow HHAs to apply for exceptions or exemptions is erroneous. Plaintiff also argues that, although Congress did not earmark monies for any such exemptions in the budget estimates, no monies were earmarked from the projected Medicare savings to pay for exemptions or exceptions to the modified per visit limitation, so the absence of a budget for both limitations is inconclusive.

Defendant disagrees. Defendant states that the reference to the limitations at issue being applied "on a discipline specific basis" confines this section to per visit limits alone, since only per visit limits are discipline specific. Defendant further argues that Congress's failure to include an exceptions provision for per beneficiary limits when it expressly included a provision allowing exceptions to per visit limits strongly suggests Congress did not intend to allow exemptions or exceptions to the per beneficiary limit. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983). Third, defendant observes that Congress never intimated that 42 U.S.C. § 1395x(v)(1)(L)(ii) was meant to apply to the per beneficiary limit as well as the per visit limit. In addition, HCFA noted that since Congress did not earmark monies for any such exemptions in the budget estimates, it is unlikely that Congress intended to allow for exemptions and exceptions. For these reasons, defendant argues, it had no choice but to preclude any opportunities for HHAs to apply for exemptions and exceptions to the per beneficiary cost limitation.

Because defendant's interpretation is reasonable, and because it is clear from its

---

11. "Discipline specific" means that the cost limits change depending on the type of visit: skilled nursing, home health aide, or therapy.

*See* Def.'s Mem. in Supp. of Def.'s Mot. to Dismiss at 30.

August 11 notice that defendant considered plaintiff's concerns, *see* 63 Fed.Reg. 42,918, this Court finds that defendant's interpretation survives arbitrary and capricious review.

### 5. *Treatment of Branch/Subunit Conversions*

Plaintiff objects to defendant's decision to classify a branch offices required by Medicare to convert to subunits as "new" agencies.[12] 63 Fed.Reg. 15, 722. In the BBA, Congress mandated that "new providers and those providers without a 12-month cost reporting period ending in fiscal year 1994" would be regulated according to the new per beneficiary limit. Pub.L. No. 105-33, § 4602(c), codified at 42 U.S.C. § 1395x(v)(1)(L)(vi)(I). Congress indicated what does not constitute a new provider without indicating what does constitute a new provider. *Id.*[13] HCFA's March 31 regulation and August 11 notice attempt to shed light on Congress's intent. The March 31 regulation provided that "new agencies" include those that have experienced changes in "operational structure," as opposed to "corporate structure," after FY 1994. 63 Fed.Reg. at 15, 721. As part of this subgroup, the regulation lists the specific situation in which a branch office of an HHA has become a subunit after FY 1994. *Id.*

### a. *Classification of Subunits under the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999*

Plaintiff contends that Congress did not intend that a branch required by Medicare to convert to a subunit be classified as new agencies. Plaintiff draws support from a provision of the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Public Law No. 105-277 (OCESAA):

> In the case of a new provider or a provider without a 12-month cost reporting period ending in fiscal year 1994, subclause (II) shall apply, instead of subclause (III), to a home health agency ... which was approved as a branch of its parent agency [before September 15, 1998] and becomes a subunit of the parent agency or a separate agency on or after such date. Pub.L. No. 105-277, codified at 42 U.S.C. § 1395x(v)(1)(L)(viii)(IV).

"Subclause (II)" increases the per beneficiary limit by two percent for new agencies whose first cost reporting period began before FY 1999; "subclause (III)" decreases the per beneficiary limit by 25 percent for new agencies whose first cost reporting period began during or after FY 1999. Plaintiff argues that this provision demonstrates that Congress intended branch/subunit conversions to be classified as "new" providers only after FY 1999. *See* Sec. Am. Compl. ¶ 44.

Defendant disagrees. Defendant reads this OCESAA provision to distinguish between two different types of "new" agency treatment, not between two "new" and "old" agency treatment. Subclauses II and III set forth formulae to be applied to new agencies. *See* 42 U.S.C. § 1395x(v)(1)(L)(viii)(II) (beginning "[s]ubject to subclause (IV), for new providers ...") and 42 U.S.C. § 1395x(v)(1)(L)(viii)(III) (beginning "[s]ubject to subclause (IV), in the case of

---

**12.** Defendant questions whether plaintiff has standing to raise this issue. Defendant claims plaintiff has not produced any evidence that this issue affects any of its members.

**13.** Congress indicated that an HHA that had "altered its corporate structure or name" would not "be considered a new provider" subject to the new per beneficiary limits. 42 U.S.C. § 1395x(v)(1)(L)(vi)(I).

a new provider ...".). Therefore, defendant argues, the OCESAA provision simply allows certain "new" HHAs to use the "new" agency formula that would have applied to them if they had converted before September 15, 1998. The provision does not mandate that agencies converting before that date be classified as "old" agencies. Under this reading, defendant's conclusion that branch offices forced to convert by Medicare qualify as "new" agencies is consistent with the statute.

This Court is persuaded by defendant's argument. The language of the two provisions is plain. They do in fact distinguish between two classes of "new" agencies. Defendant's conclusion that 42 U.S.C. § 1395x(v)(1)(L)(viii)(IV) mandates that branch/subunit conversions be classified as new agencies reflects the plain language of the statute, and is neither arbitrary nor capricious.

b. *Specification of the Limit Calculation for Surviving HHAs*

Plaintiff also complain that the August 11 clarification did not provide adequate notice-of the limit calculation for surviving HHAs, causing them to miss the October 1, 1998 deadline for choosing to be treated as an "old" agency for per beneficiary limit purposes. Defendant contends that the August 11 notice provides more than sufficient notice.

The Court finds that the August 11 notice provided sufficient notice in plain language. The August 11 notice provides that:

[i]n determining whether an agency is an new or old provider, we will consider whether the agency's provider number existed with a 12–month cost reporting period ending during Federal FY 1994. In such a case, that agency can be considered an old provider/clause v provider regardless of any changes that took place in subsequent years. However, those agencies that did not have a 12–month cost reporting period ending during Federal FY 1994 and those agencies that were certified under Medicare with provider numbers that did not exist with a 12–month cost reporting period ending during Federal FY 1994 will continue to be considered new providers/clause vi providers. 63 Fed.Reg. at 42,921.

The notice goes on to refer readers with questions about new providers to the "New Providers" section on the following page. "[R]ecogniz[ing] there are many changes an HHA may undergo including changes due to mergers, consolidations, and changes in ownership," that section delineated three loosely-defined categories of surviving agencies:

(a) An HHA with an existing provider number with a provider agreement with HCFA, (b) an HHA accepts assignment of the provider agreement and provider number which had a FY 1994 base year through a change in ownership after the FY 1994 base year, or (c) an HHA has gone through the certification process since the FY 1994 base period as a new provider and has a new provider number assigned after the applicable FY 1994 base year. 63 Fed.Reg. at 42,922.

HCFA counted categories (a) and (b) as old providers, and category (c) as new providers. It is clear from the text that these categories were not meant to be exhaustive. Finally, the next paragraph provides unambiguous language concerning the election option:

We are permitting providers that would be determined to be new providers under the policies set forth in the March 31, 1998 final notice, to elect to be considered an old provider under the policies set forth above.... These choices must be made and conveyed to the agen-

cy's fiscal intermediary by October 1, 1998. 63 Fed.Reg. at 42,922.

This language is clear and unambiguous. The Court holds that defendant's August 11 notice provided sufficient notice of the October 1, 1998 election deadline.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion for summary judgment [27–1] [27–2] is **GRANTED;** and it is

**FURTHER ORDERED** that plaintiff's cross motion for summary judgment [32–1] is **DENIED;** and it is

**FURTHER ORDERED** that the Clerk shall enter final judgment in favor of defendant and against plaintiff.

### *ORDER*

Upon consideration of the defendants' motion for summary judgment, the plaintiffs' response thereto, the plaintiffs' cross-motion for summary judgment, and the defendants' response thereto; it is hereby

**ORDERED** that defendant's motion for summary judgment [27–1] [27–2] is **GRANTED;** and it is

**FURTHER ORDERED** that plaintiff's cross motion for summary judgment [32–1] is **DENIED;** and it is

**FURTHER ORDERED** that the Clerk shall enter final judgment in favor of defendant and against plaintiff.